## JOBE *v.* URQUHART.

### Opinion delivered January 15, 1912.

1. MANDAMUS—CONTROL OVER EXECUTIVE DEPARTMENT.—Under the rule that an officer of the executive branch of the government can not be controlled by the courts in the exercise and performance of his official acts involving his judgment and discretion, the Auditor will not be compelled by mandamus to audit and pay a claim alleged to be due by the State for the purchase of the State farm unless the act of May 31, 1909, providing for its payment, divested the Auditor of any discretion. (Page 476.)

2. COURTS—CONTROL OVER EXECUTIVE DEPARTMENT.—When the courts are called on to review and control the official acts of an officer in a co-ordinate branch of the government, they should proceed with caution, and the right of the courts to exercise such power should be clear. (Page 477.)

3. STATES—LIABILITY FOR INTEREST.—A State can not be held to pay interest on her debts unless bound by an act of the Legislature or by an authorized contract of her executive officers. (Page 478.)

4. SAME—CLAIMS AGAINST—INTEREST.—Under act June 24, 1897, authorizing the Board of Penitentiary Commissioners to purchase or lease a farm upon which to work State convicts and to pay for same out of the labor or product of the convicts, the board was not expressly or impliedly authorized to contract to pay interest on deferred payments of the price of a farm so purchased. (Page 479.)

5. SAME—CLAIMS AGAINST—POWER OF LEGISLATURE.—The Legislature had the power to bind the State to pay interest upon a claim which according to the pre-existing law bore no interest. (Page 479.)

6. EVIDENCE—JUDICIAL NOTICE.—In construing the legality of acts of the Legislature, the courts take judicial knowledge of the recitals and records of the journals of both branches of the Legislature. (Page 481.)

7. STATE—APPROPRIATION TO PRE-EXISTING CLAIM.—Under Const. 1874, art. 5, section 26, providing that no money shall be appropriated or paid on any claim, the subject-matter of which shall not have been provided for by pre-existing laws, unless allowed by bill passed by two-thirds of the members elected to each branch of the General Assembly, an act in effect authorizing the Auditor to calculate the amount of interest due by the State to a claimant, not passed by two-thirds of the members of both branches of the Legislature, is void. (Page 481.)

8. PLEADING—DEMURRER—OPERATION AND EFFECT.—A demurrer to an answer admits the allegations thereof to be true. (Page 482.)

9. STATES—SUIT AGAINST AUDITOR—EFFECT.—A suit will not lie against an Auditor to compel him to allow a claim alleged to be due under a contract for the purchase of a State farm for convicts made with the Board of Penitentiary Commissioners; the suit being really one against the State. (Page 482.)

10. SAME—DUTY OF AUDITOR TO AUDIT CLAIM.—Under Acts 1909, p. 1218, providing that it should be the duty of the Auditor of State to calculate the amount due for the purchase of the State convict farm according to the terms of the contract made by the Board of Penitentiary Commissioners and to draw his warrant for such sum, the courts will not compel the Auditor to draw his warrant for the purchase money of such farm, where the vendor is unable to convey a portion of the lands which he agreed to convey. (Page 483.)

11. SAME—VALIDITY OF CONTRACTS WITH STATE.—Ordinarily, all contracts with the State must rest upon some legislative enactment or be specially provided for by law, and in the absence thereof, no agent or officer of the State has the power to bind the State. (Page 484.)

12. CONSTITUTIONAL LAW—JUDICIAL POWER OVER EXECUTIVE OFFICERS.— Under Kirby's Digest, sections 3401, 3408, making it the duty of the Auditor "to audit, adjust and settle all claims against the State payable out of the treasury," and providing that if any person be dissatisfied with the Auditor's decision the matter may be referred to the General Assembly, *held* that where the Auditor refuses to allow a claim, the claimant should apply for redress to the Legislature, and not to the courts. (Page 484.)

13. STATES—SUIT AGAINST.—In mandamus against the State Auditor to compel him to audit a claim for interest for the purchase of a State farm, the plaintiff will not be heard to contend that if the agreement to pay interest is void the State is not entitled to hold the land without paying the interest, as such contention would, if sustained, make the State in effect a party defendant to the suit. (Page 485.)

Appeal from Pulaski Circuit Court, Second Division; *F. Guy Fulk*, Judge; reversed.

### STATEMENT BY THE COURT.

This controversy grows out of the purchase of a convict farm by the Board of Commissioners of the State Penitentiary, who were acting under the authority vested in them by act of the General Assembly approved June 24, 1897.

The Governor, Attorney General, Secretary of State, Auditor, and the Commissioner of Mines, Manufactures and Agriculture, constituted said board.

By the terms of said act the board was given plenary powers to negotiate for the purchase or lease of a farm for the employment of the State convicts, but in case of a purchase of such farm the act limited the powers of said board in the manner of paying for same by providing that payments should be made out of the net profits arising from the operation of said farm.

Acting under this statute, the said board on the 21st day of November, 1902, entered under a contract with Edmond Urquhart, now deceased, for the purchase of two places known as the Cummins place and Maple Grove place, for which the said board agreed on the part of the State to pay $140,000, of which sum $30,000 was paid in cash, and on the unpaid balance the said board agreed to pay 6 per cent. interest per annum.

The record before us is silent as to the developments and progress under this contract until the Legislature passed an act at the session of 1909 appropriating $65,000, or so much thereof as might be necessary, to pay the estate of E. Urquhart for these farms.

Section 1 of said act reads as follows: "That $65,000, or so much thereof as may be necessary, be paid to the estate of E. Urquhart, deceased, for the purchase of convict farm according to the contract price and purchase between E. Urquhart and penitentiary commissioners purchasing farm, same to be paid out of the penitentiary fund."

Section 2 reads as follows: "It shall be the duty of the Auditor of State to calculate the amount owing to the estate of E. Urquhart according to the terms of the contract between the Board of Penitntiary Commissioners and E. Urquhart and to draw his warrant on the State Treasurer for such sum, and it shall be the duty of the State Treasurer to pay the

same out of the amount herein appropriated." (Acts 1909, p. 1218.)

On the 20th day of April, 1911, the appellee filed in the Pulaski Circuit Court, Second Division, her petition for a writ of mandamus to be dirested against John R. Jobe, as Auditor of the State of Arkansas, alleging in substance that the Board of Penitentiary Commissioners, acting under the authority vested in said board by the act approved June 4, 1897, had bought the farms of her testator, E. Urquhart. That, for the purpose of paying off the balance of indebtedness owing to said estate for the purchase price of said farm bought of her testator, the Legislature by an act approved May 31, 1909, appropriated the sum of sixty-five thousand ($65,000) dollars, or so much thereof as might be necessary, to be paid to the estate of petitioner's testator for the purchase of said farm according to the contract price and purchase thereof, and the same to be paid out of the penitentiary fund. That by the terms of said act it was made the duty of said defendant as Auditor to make the calculation of the amount of balance due and draw his warrant on the State Treasurer for such sum. That, in compliance with act, said defendant did make said calculation according to the terms of the contract, and found there was due said estate the sum of $10,617.05, and the petitioner demanded that the said Auditor draw his warrant for same, which was refused; with a prayer for a writ of mandamus to be issued against said Auditor commanding him to draw his warrant on the Treasurer of the State for the amount owing to said estate."

On the 11th day of May, 1911, the defendant appeared through the Attorney General of the State, and filed a demurrer to the petition as follows:

"1. Because the facts, matters and things contained in the petition do not, in law, entitle the petitioner to a writ of mandamus or to the relief therein sought."

"2. Because the court has no jurisdiction to try this cause, as it is, in effect, a suit against the State of Arkansas."

On the same day the defendant below filed his answer or response to said petition in which he admitted the allegation of the petition to be true, but based his refusal to issue his warrant as requested, because the act of the General As-

sembly of the State of Arkansas approved June 4, 1897, which authorized the Board of Penitentiary Commissioners to purchse the farm, "did not authorize said board to contract for the payment of interest. That said board entered into a contract for the purchase of the farm at an agreed price of one hundred and forty thousand dollars, of which amount thirty thousand dollars was to be paid in cash, and said board contracted to pay interest at the rate of 6 per cent. per annum upon the balance to be paid. That in so doing the board exceeded its authority, and the provisions of the contract for the payment of interest was illegal and invalid, and did not bind the State to its performance. That the State of Arkansas had already paid to the plaintiff the full sum of $140,000, the contract price of the farm, and $26,888.62 as interest. That the balance claimed to be due is for interest, and that the act approved May 31, 1909, in so far as it appropriated any amount for the payment of interest, is unconstitutional and void."

"As a further defense, the defendant set up a partial failure of consideration of the contract of purchase, in this: The contract called for all of section 17, township 7, range 5, when in fact the plaintiff offered or tendered a deed to only a part of said section 17, which was over 280 acres of land less than the amount called for in the contract of sale.

"As a further defense, the defendant set up the fact that he was acting under the directions of the penitentiary board, and that on May 15, 1911, that body adopted a resolution which in effect directed the defendant not to issue a warrant for any further amount to the plaintiff." A copy of this resolution was made "Exhibit B" to the complaint.

It was manifest from the record before us that there is a clerical or typographical mistake relative to the date of the passage of this resolution. The copy of the resolution found in the transcript bears no date; but the answer filed on the 11th day of May, 1911, states that the resolution was passed on the 15th day of May, 1911, whcih is six days after the answer was filed.

From the history of the litigation, we conclude this resolution was passed by the board before these proceedings were begun; at least, it is safe to assume the resolution was passed before the answer was filed. This resolution reads as follows:

"Whereas, the written contract entered into between the Penitentiary Board and the Urquhart estate in November, 1902, calling for certain sections and fractional sections of land aggregating more than 7,000 acres, for which the penitentiary board agreed to pay the sum of $140,000; and,

"Whereas, the penitentiary board has, up to this time, paid said $140,000, principal, and in addition thereto has paid $26,888.62 in interest; and,

"Whereas, the Urquhart estate now claims a balance of more that $10,000 interest; and

"Whereas, said Urquhart estate does now tender the Penitentiary Board a deed containing more than 280 acres of land less than that which was specifically set out and described in the written contract with the Penitentiary Board of 1902; and,

"Whereas, the penitentiary board did not have authority to pay interest or to contract for the payment of interest in the purchase of the State farm; and, therefore be it

"Resolved, that the penitentiary board does hereby accept the deed heretofore tendered to the State for the said land, provided the Urquhart estate refund to the penitentiary, board the amount of money erroneously paid in interest to the Urquhart estate in excess of the contract price of $140,000, which is $26,888.62."

The plaintiff filed her demurrer to the response or answer of defendant as follows:

"Petitioner demurs to the response of the defendant herein on the ground that the facts therein stated do not constitute a defense to the relief prayed by the petitioner."

The records then as made up were submitted to the court, namely: the petition for the mandamus, the demurrer to same interposed by the defendant, the response or answer of the defendant, and the demurrer interposed by the plaintiff to this answer. Thereupon, the court overruled the defendant's demurrer to the plaintiff's petition, and sustained the plaintiff's demurrer to the defendant's answer.

The defendant saved proper exceptions, and elected to stand on his answer and response, declined to plead further; and thereupon the court entered a judgment in accordance

with the prayer of the plaintiff's petition, from which judgment this appeal is taken and prosecuted.

*Hal L. Norwood*, Attorney General and *W. H. Rector*, Assistant, for appellant.

Appellant's demurrer to appellee's petition should have been sustained. *Jobe* v. *Urquhart*, 98 Ark. 525. The State is not liable for interest in any case unless by express agreement she makes herself liable. 10 Ark. 61; 136 U. S. 211; 15 Tex. 72; 70 Ark. 578.

*Moore, Smith & Moore*, for appellee.

The State in all its contracts and dealings with individuals must be adjudged and must abide by the rules which govern in determining the rights of private citizens contracting with each other. 71 N. Y. 527. If the board was not authorized to contract for interest, its action in so doing was ratified by the subsequent action of the Legislature. 112 N. Y. 146; 67 Ark. 236. The Auditor can not question the right of the Legislature to make the appropriation. 23 N. E. 690; 54 Pac. 36; 31 Pac. 614; 91 Cal. 469; 27 Pac. 1089; 92 Cal. 605; 28 Pac. 673; 28 N. E. 358; 118 Ind. 502; 21 N. E. 39; 4 W. Va. 11; 19 Barb. 81; 25 L. R. A. 774; 38 N. J. L. 403; 79 N. Y. 189; 14 Ark. 687.

L. A. BYRNE, Special Judge, (after stating the facts). The records of this case present one main central question, to which all other questions to be considered naturally gravitate.

That question is, whether the act of 1909, by its terms, divested the Auditor of the State of all those official functions, judgments and discretions vested in him by the Constitution and laws ordinarily incident to his official duties, in respect to the subject-matter under consideration, and thereby left this official to perform merely a bare act of ministerial duty? Or did the Legislature by the passage of said act intend that the Auditor should retain his prerogatives and powers as the special chosen arbiter of the State to make the estimate and settlement with the appellee as to the amount legally due the estate of Urquhart, and, if necessary, issue his warrant for payment of same?

After a consideration of the whole of the subject-matter as presented by this record, if it should manifestly appear

that in the passage of the act under consideration it was the legislative intent that this State official should be stripped of all official discretion and judgment relative to the State's rights on all questions which had arisen or might arise in making a settlement under the contract of purchase of the land in question, irrespective of the justice or merits of such demands, then this action is proper, and should be upheld.

If, upon the other hand, by a fair construction of said act, it can be reasonably inferred that the Legislature did not intend to take the whole matter from the Auditor and deprive him of the exercise of the functions of his office in making his estimates of the amount legally due under the contract of purchase, and he might refuse to issue his warrant for a sum demanded by the appellee which he believed was clearly illegal and unfair to the State, then under the law the Auditor would be justified in refusing the warrant demanded by the appellee, and this suit must fail, by reason of the well recognized rule of law, adhered to by both the Federal and State courts, that an officer of the executive branch of the government can not be controlled by the courts in the exercise and performance of his official acts, involving his judgment and discretion. When the courts are called on to review and control the official acts of an officer in a co-ordinate branch of the government, they should proceed with extreme caution and circumspection, and the right of the courts to exercise this power should be manifestly clear and free from doubt and not made to depend upon uncertainties or the doubtful construction of a statute.

Having premised the consideration of this case, we will now pass to a discussion of the questions involved.

It is contended by the defendant, and made a part of his answer, that the Board of Commissioners of the Penitentiary, when they made and entered into the contract of purchase of the land in question, exceeded their authority in obligating the State to pay interest on the deferred payments, and for this reason the contract to pay six per cent. interest on the balance of the purchase money is to that extent void.

The act approved June 4, 1897, authorized said board to purchase or lease a farm or farms upon which to work State convicts, and to pay for the same out of the labor or product of any of the convicts, provided the board shall only apply

such proceeds for the payment of said farm as are not actually needed for the support and maintenance of the State convict farm. The act further provides that said board is impowered to perform any and all acts necessary in the purchase or lease and equipping of said farm.

The contract for the purchase of the land in controversy was not made until November, 1902, whereby, according to the pleadings, the board bound the State to pay $140,000 for the land, $30,000 of which was paid in cash, and $110,000 to be paid at some future date or dates; but as to the maturity of this balance the records before us do not disclose. However, the records show there was a stipulation in the contract for the State to pay six per cent. interest per annum on this balance.

The appellee concedes in her brief that the State is not bound by the unauthorized acts of its agents in agreeing to pay interest, but contends that "this authority may be expressed or implied."

The court can not subscribe to this doctrine to its fullest extent. The General Assembly is the sole and supreme legislative power of the State, and that body has the inherent right to legislate upon all questions affecting the general welfare of her people, except in so far as it is restrained or limited by the Constitution.

The General Assembly has plenary powers to contract for and create interest-bearing indebtedness on the part of the State, except to issue interest-bearing treasury warrants or scrip. But the authority to bind the State to the payment of interest on her indebtedness must be plainly expressed and not implied.

If the State could be bound to pay interest by implication, then, to extend a rule of this kind to its legitimate results, every debt of the State could or should draw interest.

It is well settled both upon principle and authority that a State can not be held to the payment of interest on her debts unless bound by an act of the Legislature or by a lawful contract of her executive officers made within the scope of their duly constituted authority. *State* v. *Thompson,* 10 Ark. 61; *United States* v. *North Carolina,* 136 U. S. 211; *United States* v. *Sherman,* 98 U. S. 565; *Angarica* v. *Bayard,* 127 U. S. 251; *Wes*

*tern & Atl. Rd. Co.* v. *State,* 14 L. R. A. 438; *Sawyer* v. *Colgan,* 102 Cal. 283; *Molineux* v. *State,* 109 Cal. 378; *Auditorial Board* v. *Arles,* 15 Tex. 72.

The act under discussion is silent on the question of interest. In no part of the act is any mention made of interest or any authority given to the board to contract for the payment of interest.

It is a matter of universal custom with legislatures, which has grown into a common knowledge in the business world, that in the passage of laws authorizing the State, or any subdivision thereof, or any district therein, to make and issue any interest-bearing indebtedness, the act authorizing the same, without exception, fixes the rate, or the maximum rate, of interest the indebtedness should bear.

It therefore follows that, if the Legislature really intended to confer authority on the board in the purchase of the farm to bind the State to pay interest on the unmatured part of the debt, then in the exercise of ordinary wisdom they would have had the forethought to fix the rate, or the maximum rate, the same should bear, and not turn the board loose with unlimited discretion in contracting for interest. Adopting the construction of the act, as the appellee would have us make, the board might have fixed any rate of interest emergency, as it seemed to them, might suggest, and fixed a much higher rate. This circumstance presents to us a very potential reason for believing that the Legislature did not intend that the board should bind the State by contract to pay interest on the deferred payments. It is therefore the opinion of this court that that part of said contract of purchase, in so far as it attempted to bind the State to the payment of interest, is invalid and not binding on the State.

But the appellee insists that, if the board was not authorized to contract for interest, its action in so doing was ratified by the subsequent action of the Legislature in the passage of the act approved May 31, 1909. In answer to this position, it must be conceded in the outset that the Legislature had the power and the right to extend the legal liability of the State in respect to the item of interest and to provide for its payment by appropriation of a fund for that purpose; but this must be done in the manner pointed out by the Constitution.

Prefacing what we may say upon this point, we assume that it has been clearly shown by principle and authority that the State was not bound by the contract to pay interest, and so much of that part of the contract was a nullity.

The parties to the contract will be held to a knowledge of the law in respect to the same, and under this rule of the law the appellee's testator knew he held a contract against the State which was void as to the interest feature. Therefore he had no legal demand against the State for the interest; and, if anything was paid in the shape of interest, it was in excess of what he could rightfully claim under the law.

Considering the question of interest from this viewpoint then, any money paid to him as interest would be a gift or donation, as it would be in excess of his legal demands.

The case of *Molineux* v. *State*, 109 Cal. 378, is a case very similar in principle to the one under consideration.

In 1851 certain Indian war bonds were issued under the authority of a statute. The bonds drew interest, which was evidenced by interest coupons. The plaintiff, Molineux, was the holder of a considerable amount of these interest coupons, which were long past due, having matured prior to September 1, 1856. On the 3d of March, 1894, he presented these coupons to the proper authority for allowance with a claim for legal interest from their maturity. This demand for interest on the coupons was rejected. The plaintiff sued the State, and secured judgment for the coupons and the legal interest. The State appealed.

It appears that in 1893 the Legislature of the State of California passed an act and the fifth section of the act reads as follows: "In case judgment be rendered for the plaintiff in any suit, it shall be for the amount actually due from the State to the plaintiff, with legal interest thereon from the time the obligation accrued." And the plaintiff based his claim for interest on this statute, contending that under and by virtue of same he was entitled to interest on his coupons. But the Supreme Court of the State held, first, "that the State was not liable for interest on its debt, unless its consent to be so bound is manifested by an act of its Legislature, or by some lawful contract of its executive officers."

The court further held that if the plaintiff was not le-

gally entitled to interest on his claim (coupons), either by reason of the nature of the claim or the immunity of the State from an obligation to pay interest, then the latter statute did not authorize its recovery; and as there was no liability on the State, at the time, to pay interest on the coupons, there was no legal interest for which a recovery could be had, irrespective of the provisions of the statute itself. It was contended that the statute was retrospective, and by its terms included the right to recover interest from the maturity of the coupons, but the court met this contention with the proposition that the interest claimed was prior to the passage of the act; there was no obligation on the part of the State to pay, and for the Legislature to attempt to make provision for the payment of such claim would be making a gift or donation to the claimant, and, therefore, under the restrictions of the Constitution, this could not be done."

If by the passage of the act approved May 31, 1909, the Legislature intended to fix the payment of interest on the contract made by the board, then this act must comply with the constitutional requirement.

By reference to section 26, art. 5, of the Constitution, we are confronted with this limitation:

"No extra compensation shall be made to any officers, agents, employee, or contractor after the services shall have been rendered, or the contract made; nor shall any money be appropriated or paid on any claim, the subject-matter of which shall not have been provided for by pre-existing laws, unless such compensation or claim be allowed by bill passed by two-thirds of the members elected to each branch of the General Assembly."

It is a fixed rule of this court, of long duration, and well established, that in construing the legality of acts of the Legislature this court will take judicial knowledge of the recitals and records of the journals of both branches of the General Assembly to aid the court in determining the validity of any act.

Applying this rule to the question under consideration, we have resorted to and examined the journals of the General Assembly, and from these records we gather the facts attending the passage of the act approved May 31, 1909.

The bill for the act originated in the Senate as Senate Bill

No. 237. This bill took its regular course in that body, and passed without a negative vote. Upon reaching the house the bill took its regular course, and was placed on third reading and final passage. The roll of the house being called, 54 members voted in the affirmative—21 members in the negative, and 25 members were absent and not voting. (See House Journal of the session of 1909, page 887.) It necessarily follows that, the bill having failed to receive a two-thirds vote of all the members of the house elected as required by the Constitution, that part of the act attempting to appropriate a sum of money to pay interest for which the State was not legally bound is void.

Regardless of the validity or invalidity of the act under consideration, the records of this case presents another reason fatal to the maintenance of this suit.

The defendant sets up in his answer a partial failure of consideration—alleging that the deed tendered by the appellee contained more than 280 acres of land less than the amount sold and agreed to be conveyed by the terms of said contract, and for that reason he justified himself in refusing a warrant for the entire amount.

For the purpose of reaching a conclusion on the point presented, we must presume that this allegation is true.

Both the appellant and the appellee cite the court to the case of *Jobe* v. *Urquhart*, 98 Ark. 525.

An examination of that case will disclose the fact that this identical point, of the partial failure of consideration, was before the court in that case. In that suit the plaintiff, who is the plaintiff in this suit, filed her complaint in the Pulaski Chancery Court against the Board of Commissioners of the State Penitentiary, asking for reformation of the contract of purchase of the land in controversy, so as to show that the 280 acres of land which was short of the amount agreed to be conveyed was not in fact a part of the land embraced in the contract of purchase. The court held in that case that the suit, while against the Board of Commissioners of the Penitentiary, was in reality and in fact a suit against the State, and, regardless of the merits of the defense interposed, could not be upheld, and the suit was dismissed.

We are unable to draw any discrimination or distinction

in principle between the case referred to and the one under consideration, in so far as the right to prosecute the suits and the jurisdiction of the court are concerned.

The appellee is trying to accomplish in this suit, by other methods and processes adopted, that which the court held could not be done in the former suit.

By referring to the act approved May 31, 1909, it will be seen that the Legislature directed the Auditor "to calculate the amount owing to the estate of E. Urquhart according to the terms of the contract between the Board of Penitentiary Commissioners and E. Urquhart and draw his warrant," etc.

The amount of land agreed to be conveyed under the said contract is as much a part of the *terms of the contract* as the amount of money to be paid by the State; and when a deed was tendered the Auditor with a considerable portion of the land embraced in the contract omitted, he was not in a position to make a settlement with the appellee according to the *terms of the contract* as authorized or directed by the act.

As guardian of the rights of the State, as her auditing agent, in passing on claims and demands, the action of the Auditor in refusing to issue his warrant for the entire balance of the debt claimed by the appellee, with a material shortage of the land in the deed offered, was highly proper and justified under the law.

It was not within the province of the Auditor to pass on the equity or justice of the controversy, nor inquire into the fact whether or not this shortage of land was a result of a mistake made in the contract. It was his duty to pass on the face of the papers, and when he discovered this shortage of land in the deed to refuse his warrant and refer the matter back to the proper tribunal for determination and settlement.

It will be borne in mind that these proceedings are directed against the Auditor alone, while the suit in the case of *Jobe* v. *Urquhart, supra,* was directed against the Board of Commissioners of the Penitentiary, of which the Auditor was a member.

It will be further observed that the Auditor, in so far as this case is concerned, is acting under the directions of the entire board, by virtue of a resolution passed by it, directing the Auditor to pay no further sums of money on the appellee's

debt; assigning, among other reasons for this action, the fact that there was a shortage of land contracted to be conveyed. Thereupon in effect the action of the Auditor in refusing the warrant is only a reflection of the action of the entire board; and, under the rule announced in the case of *Pitcock* v. *State*, 91 Ark. 527, and subsequently adhered to in the case of *Jobe* v. *Urquhart, supra*, this suit can not be maintained.

In the consideration of this case, it has been suggested, and pressed to the point of a contention, that the payment of interest by the State on the unmatured part of the debt was a part of the consideration to be paid for the land, and the State is morally bound to pay the interest, regardless of the legality or binding force of that part of the agreement.

·In other words, the State should not be permitted to hold the land and refuse to pay the full consideration for same, and the courts should enforce the obligation.

This position is not tenable for several reasons. In the first place, as against the State, no one can acquire vested rights in a void contract. Ordinarily, all contracts with the State must rest upon some legislative enactment, or be specially provided for by law, and no agent or officer has the power to bind the State by contract independent of a special or general statute authorizing the same. In this respect the law governing the contracts of the State is different and not so general in its application as the law regulating contracts between individuals. A void contract is in legal effect no contract. By it no rights are divested. From it no rights can be obtained. The law treats the contract as a *nudum pactum*, and the courts can not breathe life and vitality into a void contract, forsooth it may point to a moral. If contracts are to be enforced on bare moral obligations, regardless of their illegality under the law, but few contracts would escape enforcement. All contracts void for usury, contracts void as against public policy, and the like, would be subjected to the same enforcement, for like reasons.

In the next place, it does not lie within the province of the courts to speak for the State and determine and enforce her moral obligations. The courts are not the keepers of the conscience of the State. The honor and integrity of the State or sovereignty are lodged in the people—her citizens and the

subjects—and in turn the honor and integrity of her people are reflected through the Legislature of the State. The people or sovereignty speak by legislative enactment, and on all questions involving the moral obligation of the State, the Legislature is the sole and exclusive tribunal to determine and adjust such matters. Should any officers or agents in the executive branch of the government, by their acts, while in the exercise of their official discretion and duty, deny to any one their just and legal rights, an appeal can be taken for review by the legislative branch of the government to correct and redress the wrong.

In this case, if the State Auditor denied to the appellee any right which was hers to demand, the law has provided an appeal to the Legislature for review and redress.

Subdivision 1, of section 3401 of Kirby's Digest defines the duties of the Auditor, and reads as follows:

"To audit, adjust and settle all claims against the State payable out of the treasury," etc.

Section 3408 provides: "That if any person interested shall be dissatisfied with the decision of the Auditor in any claim, account or credit, it shall be the duty of the Auditor at the request of such person to refer the same with the reasons of his decision to the General Assembly."

The necessity that called for the above statute was doubtless predicated on the theory that the Auditor of the State is immune from interference in the performance of his official duties by the courts of the State, and the suitor is by virtue of this statute remitted to the Legislature for redress.

Furthermore, it is a sufficient answer to this contention to call attention to the fact that the question of the State holding the land without a complete compliance with the contract made with the board of commissioners is not before this court for a decision on that point. The appellee is not seeking a cancellation of the contract on that ground. This question is not raised by the pleadings. She is attempting to enforce a provision in a contract with the State which the law declares invalid.

Should this court entertain this contention and throw itself into the breach for the purpose of deciding this question, it would be changing the whole purpose of the suit, and would

be engaged in deciding a controversy between an individual and the State, in which controversy the State would be placed in the position of a defendant; and this could not be done without doing violence to that provision of the Constitution, which say: "The State shall never be made defendant in any of her courts."

The moment this court turns to consider questions in this case, other than the mere bare right to a writ of mandamus as asked, that moment we would be crossing well-defined lines and venturing upon forbidden grounds; so it will be seen that, instead of paving the way for this court to take jurisdiction on these grounds, and determine these questions, it only emphasizes the position taken by the court that these questions properly belong to another tribunal for determination.

We have been induced to go thoroughly into the history of this litigation, and review all the questions involved, under the apprehension that the Legislature would again be called in to pass on and adjust the rights of the State and the appellee under the contract in question; and, should the Legislature again pass on this controversy, it is to be hoped that it will do so in such plain and unmistakable terms as to leave no room for doubt.

For the reasons above assigned, it is the judgment of this court that the Pulaski Circuit Court erred in overruling the defendant's demurrer to the plaintiff's petition and in sustaining the plaintiff's demurrer to the defendant's response and answer. The judgment of the lower court is therefore reversed, and plaintiff's petition is dismissed.

McCULLOCH, C. J., (dissenting). It is conceded in the opinion of the majority that there is no limitation upon the power of the Legislature to authorize the creation of interest-bearing indebtedness of the State, except not to issue interest-bearing warrants or scrip. In this I think they are correct. But it is contended that the Legislature did not authorize the penitentiary board to contract for the payment of interest on the price of the State farm which the board was impowered to purchase. I dissent from that conclusion. That portion of the statute which impowered the board to purchase the farm reads as follows: "Said board is hereby impowered to purchase or lease and equip a farm or farms upon which to work State

-convicts, and to pay for the same out of the labor or products of the labor of any of the convicts. Said board is hereby impowered to perform any and all acts necessary in the purchase or lease and equipping of said farm or farms: provided, the board only apply such proceeds for the payment of said farms as are not actually needed for the support or maintenance of the State convict farm."

It is seen from the wording of the statute that the board was authorized to purchase a farm, pay for same out of the proceeds of convict labor, and "to perform any and all acts necessary in the purchase," etc., the only limitation placed on the power being that "the board only apply such proceeds for the payment of said farms as are not actually needed for the support or maintenance of the State convict farm. The statute clearly contemplated that the purchase should be on a credit, for no means were provided for a cash purchase. Is it conceivable that the lawmakers intended to so limit the power of the board as to necessitate a delay in the purchase of the farm until sufficient funds for that purpose could be accumulated from year to year out of the net profits of convict labor, or that they meant to require the board to find a landowner who would be willing to sell his farm to the State for a cash price and to await, without interest, the slow process of payment out of the net profits of the convict labor? Surely not, for to place that construction on the statute is to attribute to the lawmakers an intention to require the board to do an improvident thing, on the one hand, or to attempt an impossible task on the other. The presumption should be indulged that the framers of the statute meant, no words appearing which manifested a contrary intention, to meet the situation and deal with it in a practical, business-like manner, and to authorize the purchase of a farm in the only way which was practicable, not to say possible, under the existing circumstances. The power to contract for the payment of interest on what was necessarily intended to be a purchase on a credit must be implied, for the State authorized the board to "perform any and all acts necessary in the purchase." Let us concede the full propriety and force of the rule that the vesting of power in a public board or other functionary by implication is not favored, unless the implication necessarily results from

the nature of the enactment. Yet we think that the wording
of this statute meets the requirements of that rule. We per-
ceive no reason why the ordinary rules of construction in in-
terpreting statutes should not be applied to this as to any
other statute. "Statutes are seldom framed," says Mr.
Black in his work on Interpretation of Laws (§ 33), "with such
minute particularity as to give directions for every detail which
may be involved in practical application. Herein they are
aided by the doctrine of implications. This doctrine does not
impower the courts to go to the length of supplying things
which were intentionally omitted from the act, but it author-
izes them to draw inferences from the general meaning and
purpose of the Legislature and from the necessity of making the
act operative and effectual as to those minor or more specific
things which are included in the more broad or general terms
of the law or as to those consequences of the enactment which
the Legislature must be understood to have foreseen and
intended. This is not the making of law by the judges. It
is deducing the will of the Legislature by the logical process of
inference. It is a rule of construction that that which is im-
plied in a statute is as much a part of it as what is expressed."

Pursuing the subject further, the same learned author
says: "Whenever powers, privileges or property are granted
by a statute, everything indispensable to their enjoyment or
exercise is impliedly granted also, as it would be in a grant
between private persons. * * * Whenever a statute grants
power to do an act, with an unrestricted discretion as to the
manner of executing the power, all reasonable and necessary
incidents in the manner of executing the power are also
incidents in the manner of executing the power are also granted."

In another text book we find the statement in substance
of the same rule, as follows: "Statutes are not, and can not
be, framed to express in words their entire meaning. They
are framed like other compositions to be interpreted by the
common learning of those to whom they are addressed; es-
pecially by the common law, in which it becomes at once en-
veloped, and which interprets its implications and defines
its incidental consequences. That which is implied in a
statute is as much a part of it as what is expressed. * * *
Wherever a provision of a statute is general, everything which

is necessary to make such provision effectual is supplied by the common law and by implication." 2 Lewis, Sutherland, Statutory Construction, § § 500, 504.

Another statement of the same rule, which is peculiarly applicable to this case, is as follows: "The rule respecting such powers is that, in addition to the powers expressly given by the statute to the officer or board of officers, he or it has by implication such additional powers as are necessary for the due and efficient exercise of the powers expressly granted or as may be fairly implied from the statute granting the express powers." Throop on Public Officers, § 542.

This principle is clearly announced by this court in the recent case of A. H. Andrews Co. v. Delight Special School District, 95 Ark. 26, in which case it was held that, while there was no authority in the statute for school directors to contract for the payment of interest on purchases, yet, if the interest was computed as a part of the purchase price and the district accepted the goods, it would be legally bound to pay the whole price, including the interest. We think that principle is applicable here, and is controlling in the present case. The same principle is recognized as to the power of a levee board to contract for the payment of interest. Altheimer v. Board of Directors of Plum Bayou Levee District, 79 Ark. 229. In that case we held, after announcing the principle as to implied powers, that from the authority conferred by the statute to build a levee there was necessarily implied power to build on credit and to agree to pay the legal rate of interest for deferred payments.

It seems to me, therefore, that the majority of the judges have, in reaching their conclusion, departed from well settled principles of law which are not only established by the decided weight of authority elsewhere, but have been clearly recognized in several decision of this court.

But, even if it be held that the board was not authorized to contract for the payment of interest, the result should be the same so far as this case is concerned. The contract for the sale and purchase of the farm is executory, and the State is bound either to ratify the action of the board and perform the contract or to repudiate it as a whole. It can not take the property under the contract of purchase without paying

the full amount stipulated in the contract. In other words, it could not lawfully take the property without paying the interest which the board agreed to pay. This salutary rule applies to the State in its dealings with individuals as well as to individuals themselves.

"The State, in all its contracts and dealings with individuals, must be adjudged and abide by the rules which govern in determining the rights of private citizens contracting and dealing with each other. There is not one law for the sovereign and another for the subject; but when the sovereign engages in business and the conduct of business enterprises, and contracts with individuals, although an action may not lie against the sovereign for a breach of the contract, whenever the contract, in any form, comes before the courts, the rights and obligations of the contracting parties must be adjusted upon the same principles as if both contracting parties were private persons." *People* v. *Stephens*, 71 N. Y. 527.

The constitutional provision quoted in the opinion of the majority has, we think, no application to the statute making the appropriation to pay the balance due under the contract. It applies only to appropriations for extra compensation or gratuities and to claims which have not been authorized or provided for by pre-existing law. It does not mean that the Legislature can not, by a majority vote of each house, pass a bill for the purchase of property for governmental purposes and at the same time appropriate the necessary amount of money to pay for same without a preexisting law authorizing it. The Legislature could, and did, pass a bill, by a majority vote, authorizing the construction of the new State Capitol and appropriating funds to pay for same. *State* v. *Sloan*, 66 Ark. 575. It could, and did, by a majority vote, pass a bill appropriating a sum of money for the maintenance of the State militia without any pre-existing law authorizing the expenditure. *State* v. *Moore*, 76 Ark. 197. The ratification by the Legislature of the executory contract for the purchase of the farm was the same as a new purchase, and this could be done by a majority vote.

There is nothing in the California case, cited in the majority opinion, which militates against this view. In that case it is merely held that a statute authorizing interest on judg-

ments against the State was not retroactive in its effect, so as to authorize a judgment for interest on a claim which arose prior to the passage of the act.

This is not a suit against the State, but it is one against the Auditor to compel him to perform a ministerial act in making a simple calculation of the amount specified in the contract and drawing his warrant for it on the treasurer.

The law is well enough settled by this court to exclude further controversy as to when the Auditor may or may not be compelled by mandamus to issue his warrant for debts of the State. "Where the Auditor, in the discharge of his appropriate duties, has a discretion in allowing or rejecting a claim against the State, and exercises it, his decision can not be controlled or reviewed by mandamus. * * * But there is a marked distinction everywhere recognized between the exercise of discretion and a ministerial act, the performance of which is a plain and positive duty enjoined by law; and when essential to the enjoyment or completion of some public or private right, and no other adequate specific remedy is provided, the authorities concur in holding that a mandamus will lie, affording a prompt and efficient remedy, at the instance of any person interested, to compel its performance." *Danley* v. *Whiteley*, 14 Ark. 687; *Jobe* v. *Caldwell*, 93 Ark. 503.

The Legislature, acting through appropriate committees, at the session of 1903, investigated the purchase of the farm, and approved it. At the session of 1909 it passed the act in question, appropriating sufficient funds to pay "for purchase of the convict farm, according to the contract price and purchase between E. Urquhart and the Penitentiary Commission" and directing the Auditor "to calculate the amount owing to the estate of E. Urquhart, according to the terms of the contract, * * * and to draw his warrant on the State Treasurer for such sum." This took the matter out of the hands of the board so far as concerned the payment of the stipulated price, and peremptorily directed the Auditor to draw his warrant after calculating the amount. That officer was not authorized to make a settlement of the claim according to his notion of the justice of the case, nor was he permitted to follow the directions of the board, but he was directed to perform the purely ministerial act of calculating the amount shown from

the face of the written contract and the payments already made and of drawing his warrant.

The question of shortage in the number of acres was not left to him nor to the board to decide. The Legislature left that out of consideration altogether in passing the statute directing the payment of the amount specified in the contract. If the Legislature failed to provide for adjusting that matter, it was of no concern to the Auditor, for he must obey the mandate of the lawmakers, the authority to which we must all yield obedience when acting within its constitutional limitations. We must, however, indulge the presumption that the Legislature fully investigated and considered that matter, and either left it for future adjustment or determined that a mistake had been made in describing the lands, and that the State's vendor had delivered possession of all lands which were intended to be embraced in the contract.

My opinion is that the judgment of the circuit court should be affirmed.

Mr. Justice WOOD concurs herein.