SPARLING v. REFUNDING BOARD.

DENISON v. WISEMAN.

RODGERS v. WISEMAN.

LOWDEN v. WISEMAN.

Nos. 4-3496, 4-3504, 4-3505, 4-3512

Opinion delivered April 30, 1934.

190

*Barber & Henry*, (for Sparling),

*Daggett & Daggett*, (for Denison and Rodgers),

*Thos. S. Buzbee, E. L. Westbrooke* and *R. E. Wiley*, (for railroads), for appellants.

*Hal L. Norwood*, Attorney General, *Trieber & Lasley* and *Walter L. Pope*, for appellees.

McHANEY, J. While separate appeals have been taken in these several cases and separate briefs filed, except in the Denison and Rodgers cases, which were consolidated and briefed together, we are treating them as one case for the purpose of this opinion, since the same or similar questions are involved in all of them. The Sparling case, No. 3496, brings into question the constitutionality of act No. 11 of the first Extraordinary Session of the General Assembly of 1934, which act was approved February 12, 1934, as a whole and as to certain sections thereof. The other appeals question the right of the State lawfully to levy and collect a tax on gasoline sold or used in this State for agricultural and industrial purposes. In other words, that only such gasoline as may

be used in propelling motor vehicles over the highways of this State may be lawfully taxed. Further contentions are that, "even though the act (act 11) be held to apply to and impose a tax on gasoline bought or sold within the State, regardless of the character of use, such holding would not necessarily impose a tax on gasoline bought without, transported within, and thereafter used" for agricultural and industrial purposes; that said act does not impose a tax on gasoline except such as may be used in motor vehicles on the highways; and that, if it does, it contravenes § 5 of article 16 of the Constitution of this State. The chancery court sustained a demurrer to the complaint in each case, and judgments of dismissal were entered.

Turning now to a consideration of the attack made on the constitutionality of the act in the Sparling case, we find a number of grounds argued in support of the allegations of the complaint seeking to enjoin the "Refunding Board" from proceeding under the act. Section 1 thereof creates a "Refunding Board" composed of the Governor, Lieutenant-Governor, Treasurer of State, Secretary of State, State Auditor, Attorney General and State Bank Commissioner. It is argued that this section contravenes § 6 of article 19 of the Constitution, which provides: "No person shall hold or perform the duties of more than one office in the same department of the government at the same time, except as expressly directed or permitted by this Constitution." And further that it violates § 10 of article 5, which provides: "No Senator or Representative shall, during the term for which he shall have been elected, be appointed or elected to any civil office under this State." A sufficient answer to the first part of this contention is that the members of the Refunding Board are not holding or performing the duties of more than one office, membership on said board not being an additional office, but only additional duties imposed by the act on the holders of the respective offices. A sufficient answer to the second part of this contention is that the Lieutenant-Governor is neither a Senator nor a Representative. By express provision of § 1 of amend-

ment No. 6 to the Constitution, the Lieutenant-Governor is an executive officer—a member of the Executive Department of State. Section 5 of amendment 6 provides that he shall be president of the Senate, and may vote in case of a tie, but this does not make him a Senator. Moreover the creation of this board was not the creation of a new office, nor are its members new officers. As heretofore stated, new duties are imposed on existing executive officers. The executive State officers are now members of various boards and have, for a long period of time served thereon, such as the State Board of Election Commissioners, State Burning Board, State Printing Board, etc., and many others in the past which have been abolished. See *Bruce* v. *Matlock,* 86 Ark. 555, 111 S. W. 990; *Russell* v. *Cone,* 168 Ark. 989, 272 S. W. 678.

The second contention is that § 22 of the act is violative of § 5, article 15 of the Constitution. This will be considered later in this opinion in connection with the Denison and other cases.

It is next contended that § 51 of the act is violative of § 1, article 5, of the Constitution which provides that "the legislative powers of this State shall be vested in a General Assembly, which shall consist of the Senate and House of Representatives." Section 51 of the act provides that when the net revenue credited to the State Highway Fund in any fiscal year shall exceed $10,000,000 and the Refunding Board finds that a reduction of the tax on gasoline during the succeeding year could be made without reducing the net revenue below that sum, said board may, "in its discretion," determine the amount of possible reduction, and make an order to that effect, not to exceed one-half of one cent a gallon. It is said this is a delegation of legislative power, because it vests a discretion in the board. This is not a delegation of legislative power, as we have many times held. In *Harrington* v. *White,* 131 Ark. 291, 199 S. W. 92, this court quoted with approval from *Cincinnati, etc., Rd. Co.* v. *Commissioners,* 1 Ohio State 77, as follows: "The true distinction * * * is between the delegation of power to make the law which necessarily involves the discretion as

to what it shall be, and conferring authority or discretion as to its execution to be exercised under and in pursuance of the law. The first cannot be done. To the latter no valid objection can be made." And in *State* v. *Martin & Lipe,* 134 Ark. 420, 204 S. W. 622, it was said: "It is a well-established rule of law that legislative bodies have no right to delegate the law-making power to executive officers or administrative boards, but it is settled in this State that the Legislature may delegate 'the power to determine some fact or state of things upon which the law makes or intends to make its own action depend.' *Boyd* v. *Bryant,* 35 Ark. 69." Many other cases might be cited to the same effect. Section 51 therefore does not delegate a legislative function, but confers authority or discretion as to its execution to be exercised under and in pursuance of its provisions.

Other contentions are that the act is void because § 55 gives the Governor the power within 30 days after its approval to direct the board not to issue any bonds; in other words, to suspend the act, in violation of § 12 of article 2 of the Constitution; that it attempts to suspend the statute of limitations with respect to actions on road improvement district bonds; that the bill for the act was not properly passed in both houses; that the exchange of direct State obligations for those of road improvement districts is violative of § 1 of article 16 of the Constitution; and that the tax on gasoline may not be used to pay road district bonds. We have carefully considered all these questions and find them without substantial merit. To discuss them in detail would unduly extend this opinion. However it may be said that the Governor has not suspended the act and that the 30 days time for doing so has elapsed; that limitation of actions is subject to control by the Legislature; that the records of both Houses, of which we take judicial notice, show the act was properly passed; and that the payment of road district bonds with State bonds is not violative of § 1 of article 16 of the Constitution. *Tapley* v. *Futrell,* 187 Ark. 844, 62 S. W. (2d) 32; *Jobe* v. *Urquhart,* 102 Ark. 470, 143 S. W. 121; *Hays* v. *McDaniel,* 130 Ark. 52,

196 S. W. 934; *Bush* v. *Martineau,* 174 Ark. 214, 295 S. W. 9.

We now come to a consideration of the points raised and argued on the other appeals. In the Denison and Rodgers cases the gasoline sought to be taxed was purchased in Tennessee in large quantities, shipped into Arkansas and stored in tanks adjacent to the levees which they were engaged in constructing, and was to be used in such construction work. No part of it was to be used in propelling motor vehicles over the highways. In the Lowden *et al.* case, the trustees in bankruptcy of three railroad companies—the Rock Island, the Missouri Pacific and the Frisco—seek to enjoin the Commissioner of Revenue from collecting the tax on gasoline used in propelling motor cars over their respective railroads. The contentions of all these appellants are substantially the same.

Prior to the passage of the "Refunding Act" (act No. 11 now under consideration), such gasoline as was used by these appellants for purposes other than use on the State's highways was not taxable. In actual practice, except where bond was given, the tax on gasoline used for agricultural, industrial, domestic, railroad, levee, counties, cities, towns and miscellaneous purposes was paid by the consumer but the State refunded such tax on refund claims properly made and filed. During the calendar year 1933, out of a total tax collection of $6,542,024.79, refunds were made by the State in the sum of $553,596.38, or approximately 8 per cent. of the total collection. Perhaps from 50 per cent. to 90 per cent. or more of that amount was fraudulent. At any rate, based on past experience, the Legislature in § 24 of the "Refunding Act" repealed all prior provisions of statute authorizing refunds in the following language: "Section 44 of act No. 65 of the General Assembly, approved February 28, 1929, as amended: Paragraphs 3, 4 and 5 of § 39 of said act No. 65; paragraphs A and B of § 52 of said act No. 65, Act 127 of 1933, § 6 of act 36 of 1933, and paragraph (f) of § 24 of said act 65, are hereby repealed, provided however that refunds of the

tax collected under this act on motor vehicle fuel used for industrial purposes as now provided by law in carrying out contracts entered into for public works and *quasi*-public works prior to the first day of January, 1934, shall be made in the manner provided for by the sections and paragraphs hereby repealed.''

Now, in the face of this section, it is seriously contended that the Legislature did not mean or intend to tax gasoline other than that used on the highways. The act further provides in § 22: ''There is hereby levied a privilege or excise tax of six and one-half cents on each gallon of motor vehicle fuel as defined in this act, sold or used in this State or purchased for sale or use in this State.'' Motor vehicle fuel is defined in § 19 (b) of the act as follows: ''(b) 'Motor Vehicle Fuels' are those fuels known as gasoline, benzine, naphtha, and such other volatile and inflammable products produced or blended for the purpose of operating or propelling motor vehicles as defined in paragraph (a), provided the product commonly known as 'Kerosene Oil,' and fuel having an anti-knock rating of not less than eighty octane when tested in a series 30 knock testing engine at a jacket temperature of three hundred and seventy-five degrees Fahrenheit, known as aircraft fuel, and the product known as distillate, as defined in the following sections, are not motor vehicle fuels.'' Section 25 provides: ''The purpose of this act is to provide for the payment and collection of an excise or privilege tax on the first sale of motor vehicle fuels when sold, or the use, when used in this State; double taxation is not intended. Motor vehicle fuel manufactured, produced or compounded in or imported into this State and subsequently sold for exportation, is not taxable. The tax levied is to be collected at the source in this State of the manufacturer or wholesaler when sales of any motor vehicle fuels are made, and when not sold in this State, then when first brought into this State for use herein.'' Again it is provided in § 29 that: ''The intent of this act is to provide for the collection at the source within this State of a tax on the sale or use of motor vehicle fuel.'' It then defines ''the

source'' as to the manufacturer and the wholesaler. Section 30 provides as to refunds the following: ''Refunds of taxes on motor vehicle fuel used for industrial purposes and domestic purposes as now provided by law shall be made where such uses were made of such fuel before the passage of this act and where such uses shall be made in carrying out existing contracts for public works and *quasi*-public works, entered into prior to January 1, 1934, but all claims for refunds shall be filed within thirty days from the effective date of this act as to such uses heretofore made and within thirty days after such uses hereafter made in carrying out existing contracts for public works.''

These provisions of the act appear to us to be clear and unambiguous. Section 22 undoubtedly levies a tax of six and one-half cents a gallon on motor vehicle fuel as defined in the act, and § 19 defines ''motor vehicle fuels,'' naming them, as those ''produced or blended for the purpose of propelling motor vehicles as defined in paragraph (A).'' The word ''purpose'' as therein used means suitable for, adapted to or susceptible to. Therefore it was the clear intent of the Legislature, when these various provisions are considered together, from the language used, to tax all motor vehicle fuel sold or used in this State, regardless of the purpose to which it is put. This intention is further reinforced by the fact that the journals, of which we take notice, show that numerous amendments to exempt gasoline used for agricultural, industrial and domestic purpose from the levy of the tax, were offered, but defeated. Appellants Denison and Rodgers insist that, since their gasoline was purchased out of this State and brought into this State for use here, it is not taxable. It is difficult to follow the reasoning of these appellants in this regard. We think the fact it was bought in another State can make no difference, as the tax is also levied on the use of it in this State wherever it may have been purchased, and when brought here for use here, it loses its interstate character and becomes taxable.

But all appellants say that, if act 11 be so construed as to levy a tax on gasoline used for agricultural and industrial purposes, it is unconstitutional and void as being in violation of § 5 of article 16 of the Constitution. This is by far the most vital point raised and the one that has given us most concern, when viewed in the light of former decisions of this court. The germane part of this constitutional provision follows: "All property subject to taxation shall be taxed according to its value, that value to be ascertained in such manner as the General Assembly shall direct, making the same equal and uniform throughout the State. No one species of property from which a tax may be collected shall be taxed higher than another species of property of equal value, provided the General Assembly shall have power from time to time the tax hawkers, peddlers, ferries, exhibitions and privileges, in such manner as may be deemed proper." This court has had occasion to consider this provision in a great variety of cases. See annotation to this section in Crawford & Moses' Digest, (page 104).

It may be well to state at the outset that the fact that the act designates the tax as "a privilege or excise tax" does not necessarily make it so, for, as said in *Dawson* v. *Kentucky Dist. Co.,* 235 U. S. 288: "The name by which the tax is described in the statute is, of course, immaterial. Its character must be determined by its incidents." We are of the opinion, after so considering the act, that it is a privilege tax—a tax on the privilege of selling and using gasoline in this State, payable at the source as defined in the act, for substantially the only available use to which it may be put, for highway travel. While it is true that gasoline is used for other purposes than propelling vehicles over the highways, still the percentage of gasoline so used is comparatively negligible. Since the tax is levied and paid at the source, there is no way for the manufacturer or wholesaler to know when a sale is made, the use to which it will be put, whether for road purposes or otherwise. It is also true that the right to tax gasoline was sustained in *Standard Oil Co.* v. *Brodie,* 153 Ark. 114, 239 S. W. 753,

on the theory that it was a tax for the use of the highways, and that such use was a privilege subject to tax. There it was contended that the only available use of gasoline was for propelling motor vehicles over the highways and that a tax on the only available use to which the article is susceptible is in effect a tax on the article itself. The court refused to accept such contention as sound and said: "It may be conceded that a tax on gasoline for its only available use would, in effect, be a tax on the commodity itself, but such might not be the case as to other articles, and we are unwilling to subscribe unqualifiedly to the doctrine that a tax on the only available use of an article is in every instance a tax on the article itself. In fact, this court repudiated the doctrine in the case of *City of Ft. Smith* v. *Scruggs,* 70 Ark. 549, 69 S. W. 679, 58 L. R. A. 921, 91 Am. St. Rep. 100."

While it is true that it has been generally considered, since the decision in *Standard Oil Co.* v. *Brodie, supra,* that the State is without power to levy and collect a tax on agricultural and domestic gasoline, it is also true that, prior to that time (1921), it was generally doubted that such a tax could be levied for road purposes or any other purpose. It was also thought and seriously contended that a severance tax could not be imposed, and this court had great difficulty in arriving at the conclusion that such a tax was within Legislative power. See the different opinions in *Miller Lumber Co.* v. *Floyd,* 169 Ark. 473, 275 S. W. 741. See also *Sims* v. *Ahrens,* 167 Ark. 557, 271 S. W. 720, for doubts about the validity of an income tax law. The Constitution of this State was adopted in 1874. It was not made for those times alone. It was intended to be, and is, a living, growing instrument, yielding to the necessities of the people in the advancement of civilization. This court has for nearly 100 years so regarded it and former Constitutions and has broadened and expanded its construction of them to meet the necessities of the people of this State. It is true that this court has always held that the Legislature cannot lay a tax for State revenue on the theory that it is a privilege tax on occupations that are of com-

mon right. The State is not taxing the right to sell or the right to use gasoline, but only the sale and the use for highway purposes, as only a negligible per cent. is used otherwise. To this we perceive no constitutional objection. It is in accord with *Standard Oil Co.* v. *Brodie, supra.* See *Monamotor Oil Co.* v. *Johnson,* 292 U. S. 86, 54 S. Ct. 575. Nor can we see why appellants should raise the question. None of them can be hurt by the imposition of the tax. Appellant contractors will take it into account in bidding for contracts. Appellant railroads are forever relieved of the road improvement district taxes which they formerly paid in annual sums largely in excess of the tax now paid. Agriculture is relieved in the same way as the railroads.

Let it be definitely understood that the tax imposed is not a property tax, but is a privilege tax for the use of the highways, and that the Legislature has declared the public policy of the State to be to tax all gasoline sold or used in this State for such purpose in order to prevent fraud and imposition on the State in the sale or use of a comparatively negligible quantity for other purposes.

Let the decrees in all cases be affirmed. It is so ordered.

Mr. Justice SMITH and Mr. Justice BUTLER dissent from so much of the opinion as holds the tax'on gasoline for industrial, agricultural, etc., purposes is not a property tax.

SMITH, J. (dissenting). In the Denison case gasoline purchased in Tennessee was transported into this State for the purpose of supplying motive power for stationary engines and for trucks and tractors used in the performance of a contract with the United States Government to move earth from borrow pits adjacent to the St. Francis Levee and place it on the levee, and no part of the gasoline was used in the operation of a vehicle, movable engine or machine operated or propelled or used on the public highways and roads of the State. Such is the allegation of the complaint in that case, the truth of which is admitted by the demurrer, which was sustained by the court.

In the case of the Missouri Pacific Railroad it was alleged that the Commissioner of Revenue was attempting to collect the tax of 6½ cents per gallon on 31,731 gallons of gasoline used by the Railroad Company in the month of February, 1934, in the operation of motor cars and locomotives wholly on the rails of the Railroad Company, no part of which had been used for operating vehicles of any character on any of the highways of the State. This tax, amounting to $2,062.51, for the shortest month in the year, does not appear to be *de minimis* and of inconsequential importance.

The complaints of the Frisco and Rock Island railroads contain similar allegations, the truth of which is, of course, admitted by the demurrers filed and sustained to those complaints.

The effect of the majority opinion appears to be, not that the gasoline thus used could be taxed if the gasoline was used for no other purpose, but rather that the amount thus used in comparison with all gasoline used is too small to be of importance, and that it is necessary to tax all gasoline used for any purpose whatsoever to prevent fraud being perpetrated in the collection of the tax which may lawfully be imposed. In other words, a tax not authorized by the Constitution may be collected to facilitate the collection of a tax which the Constitution does authorize. I submit that this is an innovation in taxation which finds no support in any of the cases cited in the majority opinion.

It is said that gasoline taxes refunded in the year 1933 amounted to $553,596.38, of which from 50 to 90 per cent. was fraudulently refunded. This is a very serious indictment of the efficiency of the State officials charged with this duty. The statement appears to be *dehors* the record, but, even though true, I submit that this inefficient administration of the law affords no justification for the collection of a tax contrary to the provisions of the Constitution. A more appropriate remedy would be to administer the law efficiently.

The question here presented is of vast importance, but the legal principles which should control the decision are simple and have been often stated, and have been

applied under various circumstances, beginning with the early case of *Stevens* v. *State,* 2 Ark. 291, and continuing down to the late case of *Hixon* v. *School District of Marion,* 187 Ark. 554, 60 S. W. (2d) 7027. Many of these cases were cited and reviewed in the case of *Sims* v. *Ahrens,* 167 Ark. 557, 271 S. W. 720, where the right of the State to levy and collect a tax on net incomes was upheld. The opinion of Justice WOOD on the rehearing granted in that case became and is the law, and it would be a work of supererogation to again review the various cases there cited and reviewed in the original majority opinion and in the opinion of Judge Wood which superseded it and became the majority opinion. The controlling point in that case is reflected in the second headnote, which reads as follows: "An income tax is neither a property tax nor an occupation tax, within the provisions of art. 16, § 5, of the Constitution." It was apparently the opinion of all the judges that the tax would be void if it were either. Without reviewing that case, it will suffice to say that the State's authority to tax and the sources from which that authority is derived were given the most extensive and deliberate consideration, as is reflected by the several opinions of the judges. The one point upon which there appeared to be entire accord was that section 5 of article 16, of the Constitution should be construed to mean what it plainly says, that: "All property subject to taxation shall be taxed according to its value—that value to be ascertained in such manner as the General Assembly shall direct, making the same equal and uniform throughout the State," and that: "No one species of property from which a tax may be collected shall be taxed higher than another species of property of equal value," provided that certain named occupations and privileges might be taxed as such, and certain named property should be exempt from taxation. It is unnecessary to consider these exceptions from the rule of uniformity, as they have no application to the facts of this case.

The tax sought to be collected from the levee contractor and the railroads appears to be void, I think, from the unanimous opinion of the court in the case of

*Standard Oil Co. of La.* v. *Brodie,* 153 Ark. 114, 239 S. W. 753, as being unauthorized and violative of our Constitution. That case construed our first legislation providing for the collection of a tax upon the sale of "gasoline, kerosene or other products to be used by the purchaser thereof in the propelling of motor vehicles using combustible type engines over the highways." Acts 1921, p. 685.

It was there very earnestly insisted that the legislation was void as imposing a tax upon gasoline as property, and upon that question we there said: "It is conceded in all quarters that, if the imposition is, in effect, a property tax, it is void." The legislation was upheld, not because the right to tax the sale or use of gasoline as property existed under the act, but because it had not been taxed as such. We said: "If it had been intended to tax the gasoline or its use, it would have been wholly unnecessary to describe the character of the use or the place where it was to be used, and the fact that the lawmakers incorporated these elements in laying the bases of the taxation shows unmistakably that it was intended to impose a tax upon the use of the public highways by the method described. It is clear that the tax is not imposed on the seller nor upon the gasoline while in his hands, and this of itself makes it manifest that there was no intention to levy a tax upon the sale of gasoline nor upon the gasoline itself." And, to make it perfectly clear that the gasoline could not be and was not taxed as property, it was said: "In the final analysis of this language (of the act) it comes down to the point that the thing which is really taxed is the use of the vehicle of the character described upon the public highway, and the extent of the use is measured by the quantity of fuel consumed, and the tax is imposed according to the extent of the use as thus measured." Nothing could make plainer what was then thought to be the constitutional limitation on the right to tax gasoline.

It was said by the Supreme Court of the United States in the case of *Dawson* v. *Kentucky Distilleries Co.,* 255 U. S. 288, 41 S. Ct. 272, that the name by which a tax

is designated in a statute is immaterial, and that its character must be determined by its incidents.

Here it is not even contended that the gasoline sought to be taxed in the case of the levee contractor and the railroads had any relation to the privilege of propelling vehicles or machines of any character on the highways of the State. The facts admitted by the demurrers negative that idea. It is sought to tax this gasoline used for other and different purposes because not to do so might enable gasoline which should be taxed to escape taxation.

The right of the contractor to use gasoline as a fuel to place earth upon the levee, or of the railroads to use it as a fuel to propel their cars, is no more a privilege than would be the right to use wood or coal for the same purposes, and it could not be contended that the right existed to tax the use of wood or coal not used on public highways. A common right cannot be made a privilege by merely designating it as such either by the General Assembly or by this court.

The 1933 session of the General Assembly sought to levy a tax of one per cent. of the face value of all State and county warrants, to be deducted by the State treasurer in one case and by county treasurers in the other, to provide a fund for old age pensions. This legislation was held to be violative of § 5 of article 16 of the Constitution, above quoted. The taxation of the warrants was held to be a taxation of property, and not a privilege tax, although it was so called. In that connection, it was said that no definition of property could be framed which did not include the right of ownership, and that the essential attributes of ownership are the rights of dominion, possession, enjoyment and disposition, and that these rights are included within the protective provisions of the Constitution to the same extent as the physical things to which they pertain.

I conclude, therefore, that the tax sought to be collected from the contractor and the railroads is not a privilege tax, but is in fact a property tax, and is unauthorized for that reason. For the same reason I am of the opinion that so much of the act as attempts to tax

204

gasoline used exclusively for agricultural or industrial purposes is void.

The unconstitutionality of so much of the act as authorizes the collection of the tax against the contractor and the railroads, under the facts herein existing, does not affect the remainder of the act, as it provides that, "if, for any reason, any sentence or provision of this act shall be held to be unconstitutional, it shall not affect the remainder of this act, but this act, in so far as it is not in conflict with the Constitution of this State or the Constitution of the United States, shall be permitted to stand, and the various provisions of the act are hereby declared to be severable for that purpose."

Finding no valid objection to any other portion of the act, I dissent only from so much of the majority opinion as is herein indicated.

I am authorized to say that Mr. Justice BUTLER concurs in the views herein expressed.