HUBBELL et al. v. LEONARD (MITCHELL et al., Interveners).

No. 2579.

District Court, E. D. Arkansas, W. D.

Jan. 5, 1934.

David M. Wood, of New York City, and Joseph G. Gamble, of Des Moines, Iowa (Thomson, Wood & Hoffman, of New York City, and Gamble, Read & Howland, of Des Moines, Iowa, on the brief), for complainants.

Charles T. Coleman, of Little Rock, Ark., and Walter L. Pope, Asst. Atty. Gen. (Hal L. Norwood, Atty. Gen., and Walter G. Riddick, of Little Rock, Ark., on the brief), for defendant.

John C. Sheffield, of Helena, Ark., for interveners.

Before GARDNER, Circuit Judge, and MARTINEAU and RAGON, District Judges.

GARDNER, Circuit Judge.

This is a suit in equity, brought by the plaintiffs, who are citizens of states other than Arkansas, and are not citizens of the state of Arkansas, against the defendant Roy V. Leonard, individually, and as treasurer of state of the state of Arkansas, to enjoin and restrain him from paying out certain funds of the state derived from taxation of motor vehicles and gasoline.

Plaintiffs constitute a committee, and under the terms of a written agreement dated June 1, 1933, are assignees of certain bonds and interest coupons issued by the state of Arkansas, and as such assignees are empowered to bring this suit. There is therefore a diversity of citizenship between the plaintiffs and the defendant; the amount in dispute, exclusive of interest and costs, exceeds the sum or value of $3,000; and the suit, it is alleged by appropriate averments, arises under the Constitution of the United States.

The suit has been finally submitted on the pleadings and certain admitted facts.

There are two counts in the bill of complaint, each charging a violation of section 10, article 1, of the Constitution, providing that no state shall pass any law impairing the obligation of contracts, and of the Fourteenth Amendment, providing that no state shall deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws. The material facts in connection with count 1 are as follows: By Act of the General Assembly of the State of Arkansas, known in the record as Act No. 80 (page 215), approved March 4, 1927, which amended Act of the same legislature, known as Act No. 11 (pages 17, 20), approved February 4, 1927, it was, among other things, provided as follows:

"Section 5. To hasten the completion of the state highway system as rapidly as possible, the Commission shall for each of the years 1927, 1928, 1929, and 1930, allot for new construction a sum equal to twice the aggregate amounts allotted to road districts, and for each year thereafter, until the road system of the state is brought to a parity, shall allot as a minimum a sum at least equal to the aggregate amount allotted to road districts. To provide the funds to meet this requirement, the state shall borrow each year whatever amount may be necessary, in addition to the money derived from automobile licenses and fees, gasoline and motor oil taxes, and from Federal Aid, on such terms as to interest and maturities and subject to the limitations hereinafter set out, as may be determined to be for the best interest of the highway system, and to issue State Highway notes for the amount borrowed, to be secured by a pledge of the revenues derived from automobile licenses and fees, and gasoline and motor oil taxes, and to pledge said revenues, or so much thereof as may be necessary, for the payment of said notes, and the State of Arkansas hereby pledges to the purchasers and future holders of State Highway notes that the State of Arkansas will never so long as any of said notes are outstanding permit sections 35 and 36 of Act No. 5 of the Extraordinary Session of the General Assembly of the State of Arkansas, approved October 10, 1923, to be repealed or amended so as to in any manner reduce the revenue therein provided for, and the State of Arkansas further pledges that in the event of a substitute fuel for motor vehicles, or in the event of improvement in equipment that would reduce gasoline consumption or other change of conditions that would reduce the annual revenue from automobile licenses and fees, and gasoline and motor oil taxes below seven million five hundred thousand dollars ($7,500,000.00) that in such event the state will amend section 35 and 36 so as to provide for an annual minimum revenue from automobile licenses and fees and gasoline and motor oil taxes of seven million five hundred thousand dollars ($7,500,000.00) and the State of Arkansas further pledges that it will not issue in the aggregate more State Highway notes than can be fully paid, with interest thereon, from a revenue of seven million five hundred thousand dollars ($7,500,000.00) a year during the period beginning with the first maturity date and ending with the last maturity date of said notes.

"The State Treasurer shall set aside out of the first revenue collected from automobile licenses and fees, and from gasoline and motor oil taxes during the first half of each fiscal year, a sum sufficient to pay the interest on the State Highway notes, and the maturing notes, due and payable during the first half of the fiscal year, and shall set aside out of the first of said revenues collected during the last half of each fiscal year, a sum sufficient to pay the interest on the State Highway notes, and the maturing notes, due and payable during the last half of the fiscal year.

"Such notes issued by the state shall be known as State Highway notes, shall be signed by the Governor, the State Treasurer and the State Highway Commissioner, and

attested by the Secretary of State, and shall state in the face of said notes that the revenues derived from automobile licenses and fees, and from gasoline and motor oil taxes, are pledged for the payment of such notes.

"The State Auditor, with the approval of the Governor, shall prepare the form of said notes. Said notes shall be in denominations of one thousand dollars or multiples thereof, and shall be payable to bearer, but shall contain a provision for being converted into registered notes by being registered in the office of the State Treasurer. Said notes shall be negotiable paper notwithstanding they are payable out of a special fund derived by the state from automobile licenses and fees, and gasoline and motor oil taxes.

"The state shall sell State Highway notes only as the Highway Commission finds that funds are needed, and shall not sell more than thirteen million dollars of notes in any calendar year. No notes shall be sold until the State Treasurer shall first have advertised for bids in newspapers, periodicals, or financial journals selected by him, the advertisement to be published not less than twenty (20) days before the day of sale. All bids shall be opened in public, and the state shall have the right to reject any and all bids, and may if it deems best, auction the sale of such notes. Said notes shall not be disposed of at less than par on the basis of interest at the rate of five per cent per annum plus accrued interest from date of notes to date of delivery, but if said notes should bear a less rate of interest, they may be disposed of at less than par, provided that on the basis of the amount at which the notes are sold, and the rate of interest they bear, the interest shall not exceed the equivalent of five per cent per annum on the par or face value of the notes, exclusive of the expenses incident to the sale of said notes."

By Act No. 6 of the General Assembly, approved October 3, 1928, it was provided that, in addition to the provisions contained in the above-quoted act, the state highway commission might sell short-term notes maturing within a year, the issuance of which, however, was not to affect the power to issue state highway notes pursuant to the terms of the statute, but the proceeds of the sale thereof were to be used to pay any outstanding short-term notes and interest. This statute further provided that not more than $18,000,000 par value of notes should be sold in any calendar year beginning with the year 1928, and, if in any year the sale of notes should be deemed inadvisable, sufficient in amount might be sold in subsequent years to bring the average up to $18,000,000 a year.

By Act No. 65 (page 264), approved February 28, 1929, the General Assembly again in substance re-enacted the provisions of the foregoing statutes.

Pursuant to the authority contained in these various acts, the state from time to time issued certain highway obligations amounting in the aggregate to the par value of $84,000,000, bearing interest at the rate of 4½ per cent. per annum, payable semi-annually.

Plaintiffs are the owners and holders of the legal title to a large quantity of each of these issues of bonds under these various statutes, aggregating $41,833,000, and on all of which one semiannual installment of interest falling due in 1933 is past due and unpaid.

In each of these obligations, it is, among other things, provided:

"The State of Arkansas also covenants that this and all other obligations of this series shall be paid promptly as they mature, and to that payment the full faith and credit of the State are irrevocably pledged. As special security for the payment of this and the other obligations of this series, the State of Arkansas hereby pledges its revenues derived from automobile licenses and fees and from its tax on gasoline and on any substitute therefor used in propelling automobiles on its highways.

"The State of Arkansas covenants that its treasurer of state will set aside out of the first revenue collected from automobile licenses and fees and from taxes on gasoline and on any substitute therefor during each semi-annual period, funds sufficient to pay all obligations of this series and interest thereon maturing and accruing during such period."

By sections 35 and 36 of Act No. 5 of the General Assembly, approved October 10, 1923 (Ex. Sess., pp. 53, 54), a tax of 4 cents per gallon was levied on each gallon of gasoline sold in the state for the purpose of propelling any automobile or motor vehicle on the public roads in the state, and a tax of 10 cents per gallon was levied on each gallon of motor oil so sold, and a fee for the registration and licensing of all motor vehicles was also levied.

Section 6 of this act (page 19) created a special fund in the state treasury, to be known as the "state highway fund," and provided

that thereafter the state's portion of all automobile fees, licenses, and privilege taxes, gasoline tax, motor oil tax, and all other moneys received by the state from owners of motor vehicles in connection with the use of the public roads, should be paid into this fund.

Section 64 of the same act (page 80) provided that it should be the duty of the treasurer of the state to credit the money collected and received by him from the gasoline and motor oil tax, under the provisions of the act, to the state highway fund, and that the money so collected should be used exclusively for the purposes set forth in the act.

This act was modified by Act No. 65 (page 264), approved February 28, 1929, as to the amount of fees to be charged for the registration and licensing of motor vehicles, but the provisions of sections 6, 35, 36, and 64 were re-enacted and retained.

By Act No. 63 (page 171), approved February 25, 1931, provision was made for the levy of a privilege tax of 6 cents on each gallon of motor vehicle fuel sold in the state, and of this tax five-sixths was to be deposited in the state treasury to the credit of the state highway fund, and one-sixth, under certain conditions, was to be credited to a fund known as the county highway fund. Section 6 of this act (page 178) reads in part as follows:

"Section 6. Nothing contained in this Act shall be construed as conflicting with or repealing Section 20 of Act 65 of the Acts of 1929, and to this end it is hereby provided that should the revenue produced under Act 65 of the Acts of 1929 be less than $7,500,000 for any year, then and in that event, such deficit shall be taken from the county highway fund for such year, before an allotment to the counties is made as provided for in this Act.

"It being expressly understood that all funds derived from the operation of this Act or from the operation of said Act 65 of the Acts of 1929 shall be applied first to the payment of state highway notes or bonds and coupons issued by the State of Arkansas under the provisions of Act 11 of the Acts of 1927 and under the provisions of Act 65 of the Acts of 1929."

During each of the years from 1927 to 1932, both inclusive, the avails of the taxes arising from the tax on gasoline and automobile license taxes, provided for by the above-mentioned acts, amounted in the aggregate as follows:

| Year. | Total. | Gasoline Tax. | Auto License Tax. |
|---|---|---|---|
| 1927 | $ 7,863,312.86 | $4,333,737.46 | $3,524,575.40 |
| 1928 | 9,245,500.27 | 5,578,697.76 | 3,666,802.51 |
| 1929 | 10,672,487.55 | 6,617,131.00 | 4,055,356.55 |
| 1930 | 10,901,824.92 | 6,761,907.26 | 4,139,917.66 |
| 1931 | 9,055,858.94 | 5,686,019.43 | 3,369,839.51 |
| 1932 | 7,408,525.07 | 4,660,898.54 | 2,747,626.53 |

By Act No. 6 (page 19), approved January 30, 1933, and by Act No. 36 (page 95), approved February 27, 1933, the fee theretofore provided for the registration and licensing of motor vehicles was reduced, so that during the months from January to June, 1933, both inclusive, the avails of the taxes levied for gasoline tax and auto license fees by virtue of the legislative acts of 1933, were as follows:

| Total. | Gasoline Tax. | Auto License Tax. |
|---|---|---|
| $2,929,327.18 | $2,011,029.31 | $918,297.87 |

The amount of funds required to meet the interest payments and maturities upon the state highway obligations issued and sold pursuant to statutory enactments from the years 1927 to 1934, are as follows:

| Year | Maturities. | Interest. |
|---|---|---|
| 1927 | None | $ 292,500.00 |
| 1928 | None | 861,250.00 |
| 1929 | None | 1,712,500.00 |
| 1930 | None | 2,287,500.00 |
| 1931 | None | 3,598,700.00 |
| 1932 | None | 3,992,500.00 |
| 1933 | None | 3,992,500.00 |
| 1934 | None | 3,992,500.00 |

The 1933 General Assembly passed a series of statutes which plaintiffs assert are unconstitutional; among these acts being Acts Nos. 6 and 36.

Among the other acts complained of is Act No. 48 (page 130), approved February 22, 1933, which amended the first paragraph of section 6 of Act No. 63 of the Acts of 1931 (page 178), approved February 25, 1931, by striking therefrom the following:

"And to this end it is hereby provided that should the revenue produced under Act 65 of the Acts of 1929 be less than $7,500,000 for any year, then and in that event, such deficit shall be taken from the county highway fund for such year, before an allotment to the counties is made as provided for in this Act."

This act further provided that the counties should receive the one-cent allotment under Act No. 63 by the following provision:

"Except the said sixth-cent gasoline tax refund to the counties, it is hereby expressly understood that all funds derived from the operation of this act or from the operation of said Act 65 of the Acts of 1929 shall be ap-

plied first to the payment of state highway notes or bonds and coupons issued by the State of Arkansas under the provisions of Act 11 of the Acts of 1927 and under the provisions of Act 65 of the Acts of 1929."

By section 4 of this act (Acts 1933, p. 134) it is declared that the specific purposes of the act are to so amend and repeal existing laws as to insure adequate aid for the construction of permanent roads constituting school bus routes, rural mail routes, United States mail routes, and farm-to-market roads in the various counties, and to further assure that the gasoline tax apportioned to the various counties under the provisions of Act No. 63 of the Acts of 1931, will be used for such purposes; "to preserve and protect to the respective counties of the state the allotment of gasoline taxes as provided in subdivision (f) of Section One of said Act 63 of the Acts of 1931 *and to prevent and prohibit any part of said tax from being paid into the State Highway fund regardless of whether or not said highway fund annually receives an income of $7,500,000.00, and to prevent the transfer of said tax to the State Highway fund, or any other fund except the county highway fund under any circumstances whatsoever.*" (Italics supplied.)

By Act No. 19 (pages 44, 45), approved February 7, 1933, it is provided as follows:

"Subject to the requirements for paying maturing State Highway notes or bonds and interest thereon, the state treasurer shall, during each of the fiscal years from March 1, 1933, to March 1, 1935, set aside semi-annually out of the first moneys coming into the State Highway Fund the sum of $1,000,000.-00 for the maintenance of the state highways and the expense of the highway department." Section 1.

By Act No. 82 (page 245), approved March 7, 1933, the General Assembly provided that the state highway fund as such should be abolished; that all funds arising from the operation of toll bridges be credited by the state treasurer to a fund to be known as the bond refunding fund, and all appropriations for the maintenance and operation of tollbridges should be paid from that fund; all funds arising from other sources to be credited to a fund to be known as the unapportioned fund. The act created in the state treasurer a fund to be known as the highway maintenance fund, and all appropriations for the expenses of the highway department and for the maintenance of the state highway system were made payable from this fund. The state treasurer was required to transfer each month from the revenues in the unapportioned fund to the highway maintenance fund the sum of $166,666.66, and the remainder of the revenue from the state highways to a fund to be known as the bond refunding fund.

By Act No. 167 (page 496), approved March 28, 1933, it is provided, among other things, that beginning January 1, 1934, the state treasurer shall set aside out of the bond refunding fund the sum of $125,000 every three months as a sinking fund to be used exclusively for the purchase of state bonds. It authorizes the issuance of state bonds in a total sum equal to the aggregate of the entire outstanding indebtedness of the state on account of the construction and maintenance of the state highway system, and for the exchange of state bonds for obligations issued on account of the state highway system.

By Act No. 183 (page 573), approved March 28, 1933, there is appropriated the sum of $4,380,000 from the bond refunding fund for the purpose of paying interest on state bonds for the fiscal year ending June 30, 1934, and a like sum for the same purpose for the fiscal year ending June 30, 1935, and appropriating from that fund, for the purpose of purchasing state bonds during the biennial period ending June 30, 1935, the sum of $250,000 for the year ending June 30, 1934, and the sum of $500,000 for the year ending June 30, 1935.

By Act No. 270 (page 837), approved March 30, 1933, it is provided that the auditor of the state, and the state treasurer, shall transfer from the bond refunding fund for each fiscal year ending June 30, 1935, the sum of $250,000, and place this amount to the credit of the charities fund.

By Act No. 12 (1st Ex. Sess.), approved August 24, 1933, it is provided, among other things, that the refunding board, created by Act No. 167 for the year 1933, be directed and empowered to defend all suits brought against the state, or any of its officers, making an attack upon Act No. 167, or seeking to prevent the refunding of obligations therein mentioned, or to prevent the maintenance of state highways; and this board is authorized to compromise, discharge, and adjust any obligations to be refunded under Act No. 167, except such claims as might be compromised and settled by the highway audit commission. This act appropriates the sum of $60,000, or so much thereof as may be necessary to enable the board to carry out the provisions of the act.

Various other acts of the same general character were passed by the 1933 General Assembly, the purpose and effect of which was to divert the funds that had theretofore been pledged and appropriated to the payment of interest and principal of the state highway bonds, to some other purpose.

The second count of the bill of complaint involves tollbridge bonds issued by the state, and the issues there presented are in principle identical with those raised in the first count.

The defendant as state treasurer, pursuant to the provisions of the various acts passed by the 1933 General Assembly, has paid out and disbursed of the funds in his possession and in the state highway fund, or the highway maintenance fund, or the bond refunding fund, the sum of at least $52,000 for and on account of warrants of less than $100 par value each, and has set aside from the moneys in his hands in these funds, or some of them, during each month from January to June, 1933, both inclusive, the sum of $166,666.66 for road maintenance, and he intends to continue to set aside and disburse these funds pursuant to the various acts of the 1933 General Assembly. He also intends to disburse, pursuant to the various 1933 legislative acts, all of the funds theretofore pledged, and it is the contention of the plaintiffs that the diversion of these revenues is an impairment of the contracts entered into between the state of Arkansas and the holders of the highway and tollbridge obligations issued pursuant to the prior legislation, in violation of section 10 of article 1 of the Constitution of the United States; that the holders of these obligations became vested with the right to have these various fees and taxes levied and collected as set forth in the legislative acts authorizing the issuance of the bonds and in the bonds themselves.

In their prayer for relief, plaintiffs ask that the defendant, individually and as state treasurer of the state of Arkansas, together with his agents, servants, and employees, be enjoined from disbursing or paying out any of the revenues derived from the imposition of the taxes and license fees described in the bill of complaint, pursuant to the unconstitutional acts of the 1933 General Assembly, and that it be adjudged that the holders of these bonds are vested with the first, prior, and paramount rights to such revenues, and that the various acts of the 1933 General Assembly, seeking to divert said revenues from the purpose for which they were originally levied and authorized, be held to be null and void.

The case has been ably presented by counsel on either side, both by oral argument and printed briefs.

At the very threshold of this controversy, the jurisdiction of the court is challenged, on the ground that the suit, though in form against Roy V. Leonard, individually and as treasurer of state, is in effect a suit against the state. This objection is to be considered with reference to the Eleventh Amendment and with reference to section 10 of article 1 of the Constitution.

The Eleventh Amendment to the Constitution provides that the judicial power of the United States shall not be construed to extend to any suit in law or in equity commenced or prosecuted against one of the United states by citizens of another state. Section 10 of article 1 in effect provides that "No State shall * * * pass any Bill of Attainder, ex post facto law, or law impairing the obligation of contracts."

The Legislature authorized the issuance of these bonds and made provision for their payment. The validity of this legislation was passed upon by the Supreme Court of Arkansas before the bonds were actually negotiated. Bush v. Martineau, 174 Ark. 214, 295 S. W. 9, 11; Jobe v. Urquhart, 102 Ark. 470, 143 S. W. 121, Ann. Cas. 1914A, 351; Tapley v. Futrell (Ark.) 62 S.W.(2d) 32.

In Bush v. Martineau, supra, the court held that the Legislature had plenary power to contract for and create interest-bearing indebtedness on the part of the state. In the course of the opinion it is further said:

"If the Legislature has 'plenary power to contract for and create interest-bearing indebtedness,' when 'the authority to bind the state to the payment of interest on her indebtedness' is plainly expressed in the act, as held in Jobe v. Urquhart, supra, then it would appear to be certain that it could validly exercise such power for the building of roads when the act expressly declares it to be the policy or 'purpose' of the state so to do."

Again the court said:

"It is difficult to perceive why the state's full faith and credit should not be pledged, if it is to borrow any money. The fact that it pledges the funds arising from the tax on gas, oil, and motor vehicles does not relieve the state otherwise."

Accepting the construction of the Arkansas Supreme Court as to the validity of this legislation, we may properly assume that the bonds issued pursuant to these acts constitute valid obligations of the state. These acts of

the Legislature authorizing the issuance of the bonds and contracting for their payment, became a part of the state's contract, and in effect these provisions are embodied in the bonds themselves, leaving no doubt of the intention of the parties that the legislation should be read into the contract. United States ex rel. Von Hoffman v. Quincy, 4 Wall. 535, 18 L. Ed. 403; Board of Liquidation v. McComb, 92 U. S. (2 Otto) 531, 23 L. Ed. 623; Louisiana v. Pilsbury, 105 U. S. 278, 26 L. Ed. 1090; Wolff v. New Orleans, 103 U. S. 358, 26 L. Ed. 395; Moore v. Otis (C. C. A. 8) 275 F. 747, 751; Moore v. Gas Securities Co. (C. C. A. 8) 278 F. 111.

The Circuit Court of Appeals for this circuit, in Moore v. Otis, supra, had before it this identical question, and in the course of the opinion it is there said:

"The laws existing at the time of the issuance of the bonds and under the authority of which they were issued, enter into and become a part of the contract in such way that the obligation of the contract cannot thereafter be in any way impaired or its fulfillment hampered or obstructed by a change in the law."

There can be no doubt that the effect of the various acts of the 1933 General Assembly was to impair the obligation of these contracts. With commendable frankness this was admitted on oral argument. In the brief of defendant which has been submitted since the oral argument, it is urged that the question whether the acts of the Legislature impair the obligation of the contract or furnish protective color for the threatened act of the defendant cannot be considered or adjudicated until it is first determined whether or not the suit in effect is a suit against the state, because it is said that, if the suit is in reality a suit against the state, this court is without jurisdiction to determine any other question or issue, and has no alternative but to dismiss the suit.

The state is not named as a party to this suit, but, if the state is the real party in interest, and the officer is merely a nominal party, then the suit is in substance one against the state, and cannot be maintained. Carolina Glass Co. v. South Carolina, 240 U. S. 305, 36 S. Ct. 293, 60 L. Ed. 658; Farish v. State Banking Board, 235 U. S. 498, 35 S. Ct. 185, 59 L. Ed. 330; Lankford v. Platte Iron Works Co., 235 U. S. 461, 35 S. Ct. 173, 59 L. Ed. 316; Hopkins v. Clemson Agri. College, 221 U. S. 636, 31 S. Ct. 654, 55 L. Ed. 890, 35 L. R. A. (N. S.) 243; Cunningham v. Macon & B. R. Co., 109 U. S. 446, 3 S. Ct. 292, 609, 27 L. Ed. 992; Christian v. Atlantic & N. C. R. Co., 133 U. S. 233, 10 S. Ct. 260, 33 L. Ed. 589; Cargile et al. v. New York Trust Co. (C. C. A. 8) 67 F.(2d) 585.

We cannot, however, agree with counsel for defendant that in considering the question as to whether this is a suit against the state, we should not give attention to the question as to whether the legislative acts, under color of which the defendant claims the right to act, are void as violative of the contract clause of the Constitution. If these acts are unconstitutional, and for that reason void, they furnish no protection for the acts of the officer, and hence a suit to enjoin such acts could not be said to be a suit against the state. Greene v. Louisville & I. R. Co., 244 U. S. 499, 37 S. Ct. 673, 676, 61 L. Ed. 1280, Ann. Cas. 1917E, 88; Ex parte Young, 209 U. S. 123, 28 S. Ct. 441, 450, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764; Poindexter v. Greenhow, 114 U. S. 270, 5 S. Ct. 903, 962, 29 L. Ed. 185, 207; Pennoyer v. McConnaughy, 140 U. S. 1, 11 S. Ct. 699, 701, 35 L. Ed. 363; Rolston v. Crittenden, 120 U. S. 390, 7 S. Ct. 599, 30 L. Ed. 721; Tindal v. Wesley, 167 U. S. 204, 17 S. Ct. 770, 42 L. Ed. 137; Hopkins v. Clemson Agri. College, 221 U. S. 636, 31 S. Ct. 654, 656, 55 L. Ed. 890, 35 L. R. A. (N. S.) 243; Looney v. Crane Co., 245 U. S. 178, 38 S. Ct. 85, 62 L. Ed. 230; Houston v. Ormes, 252 U. S. 469, 40 S. Ct. 369, 370, 64 L. Ed. 667; Old Colony Trust Co. v. City of Seattle, 271 U. S. 426, 46 S. Ct. 552, 70 L. Ed. 1019; Terrace v. Thompson, 263 U. S. 197, 44 S. Ct. 15, 68 L. Ed. 255; Public Service Co. v. Corboy, 250 U. S. 153, 39 S. Ct. 440, 63 L. Ed. 905; Cavanaugh v. Looney, 248 U. S. 453, 39 S. Ct. 142, 63 L. Ed. 354; Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 14 S. Ct. 1047, 38 L. Ed. 1014; Sterling v. Constantin, 287 U. S. 378, 53 S. Ct. 190, 193, 77 L. Ed. 375; Cargile et al. v. New York Trust Co. (C. C. A. 8) 67 F. (2d) 585, 588.

In Greene v. Louisville & I. R. Co., supra, the Supreme Court was met with the contention that the plaintiff could not maintain the suit to restrain certain state officers from performing certain acts under legislative acts which were claimed to be unconstitutional. In the course of the opinion the court said:

"A fundamental contention of appellants is that the present actions, brought to restrain them in respect of the performance of duties they are exercising under the authority of the state of Kentucky, are in effect suits against the state. Questions of this sort have arisen

152

many times in this court, but the matter was set at rest in Ex parte Young, 209 U. S. 123, 150, 155, 52 L. Ed. 714, 725, 727, 13 L. R. A. (N. S.) 932, 28 S. Ct. 441, 14 Ann. Cas. 764, where it was held that a suit to restrain a state officer from executing an unconstitutional statute, in violation of plaintiff's rights and to his irreparable damage, is not a suit against the state, and that 'individuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action.' "

We think this pronouncement may well be accepted by this court as an authoritative statement of the law based upon all the previous decisions of the Supreme Court.

Great reliance is placed upon the decision in In re Ayers, 123 U. S. 443, 8 S. Ct. 164, 31 L. Ed. 216. That case was urged on behalf of petitioner in Ex parte Young supra, and in reviewing the Ayers Case, the court in Ex parte Young, said:

"The cases upon the subject were reviewed, and it was held (Re Ayers, 123 U. S. 443, 31 L. Ed. 216, 8 S. Ct. 164), that a bill in equity brought against officers of a state, who, as individuals, have no personal interest in the subject-matter of the suit, and defend only as representing the state, where the relief prayed for, if done, would constitute a performance by the state of the alleged contract of the state, was a suit against the state (page 504 [of 123 U. S., 8 S. Ct. 164]), following in this respect Hagood v. Southern [117 U. S. 52, 6 S. Ct. 608, 29 L. Ed. 805], supra.

"A suit of such a nature was simply an attempt to make the state itself, through its officers, perform its alleged contract, by directing those officers to do acts which constituted such performance. The state alone had any interest in the question, and a decree in favor of plaintiff would affect the treasury of the state."

Again the court said, in referring to the Ayers Case:

"But the injunction asked for in the Ayers Case, 123 U. S. [443, 8 S. Ct. 164, 31 L. Ed. 216], supra, was to restrain the state officers from commencing suits under the act of May 12, 1887 (alleged to be unconstitutional), in the name of the state and brought to *recover taxes for its use,* on the ground that, if such suits were commenced, they would be a breach

of a contract with the state. The injunction was declared illegal because the suit itself could not be entertained, as it was one against the state, to enforce its alleged contract. It was said, however, that, if the court had power to entertain such a suit, it would have power to grant the restraining order preventing the commencement of suits. (Page 487 [of 123 U. S., 8 S. Ct. 164]). It was not stated that the suit or the injunction was necessarily confined to a case of a threatened direct trespass upon or injury to property."

In the instant case, no affirmative relief is sought against the defendant, but it is sought to enjoin him from carrying out unconstitutional statutes invading the constitutional rights of the plaintiffs.

In Pennoyer v. McConnaughy, supra, suit was brought to restrain an officer from acting under a statute which was violative of section 10, article 1, of the Constitution. In considering the question whether the suit was in effect one against the state, the court, in an opinion by Mr. Justice Lamar, among other things, said:

"A very large number of cases involving a variety of questions arising under this amendment have been before this court for adjudication; and, as might naturally be expected, in view of the important interests and the wide-reaching political relations involved, the dissenting opinions have been numerous. Still, the general principles enunciated by these adjudications will, upon a review of the whole, be found to be such as the majority of the court and the dissentients are substantially agreed upon.

"It is well settled that no action can be maintained in any federal court by the citizens of one of the states against a state, without its consent, even though the sole object of such suit be to bring the state within the operation of the constitutional provision which provides that 'no state shall pass any law impairing the obligation of contracts.' This immunity of a state from suit is absolute and unqualified, and the constitutional provision securing it is not to be so construed as to place the state within the reach of the process of the court. Accordingly, it is equally well settled that a suit against the officers of a state, to compel them to do the acts which constitute a performance by it of its contracts, is, in effect, a suit against the state itself.

"In the application of this latter principle, two classes of cases have appeared in the decisions of this court, and it is in determin-

ing to which class a particular case belongs that differing views have been presented.

"The first class is where the suit is brought against the officers of the state, as representing the state's action and liability, thus making it, though not a party to the record, the real party, against which the judgment will so operate as to compel it to specifically perform its contracts. ٭ ٭ ٭

"The other class is where a suit is brought against defendants who, claiming to act as officers of the state, and under the color of an unconstitutional statute, commit acts of wrong and injury to the rights and property of the plaintiff acquired under a contract with the state. Such suit, whether brought to recover money or property in the hands of such defendants, unlawfully taken by them in behalf of the state, or for compensation in damages, or, in a proper case where the remedy at law is inadequate, for an injunction to prevent such wrong and injury, or for a mandamus, in a like case, to enforce upon the defendant the performance of a plain, legal duty, purely ministerial, is not, within the meaning of the eleventh amendment, an action against the state."

As has been observed, in the instant case no affirmative relief is asked against the defendant. It is not sought to compel him to perform the state's contract, but we are asked to enjoin him from acts authorized by the unconstitutional statutes which would be violative of plaintiffs' rights guaranteed by the Constitution.

By valid legislative enactments, which became part of the contracts involved, certain revenues were set aside and appropriated to the payment of the interest and principal of these obligations. The defendant now, acting under color of unconstitutional statutes, is threatening to divert these funds to the irreparable injury of the plaintiffs. His threatened affirmative action is what is sought to be enjoined. As said by the Supreme Court in Hopkins v. Clemson Agricultural College, supra:

"The many claims of immunity from suit have therefore been uniformly denied, where the action was brought for injuries done or threatened by public officers. If they were indeed agents, acting for the state, they—though not exempt from suit—could successfully defend by exhibiting the valid power of attorney or lawful authority under which they acted. Cunningham v. Macon & B. R. Co., 109 U. S. 446, 452, 27 L. Ed. 992, 994, 3 S. Ct. 292, 609. But if it appeared that they proceeded under an unconstitutional statute,

their justification failed, and their claim of immunity disappeared on the production of the void statute."

In Houston v. Ormes, supra, there was involved a suit to establish an equitable lien for attorney's fees upon a fund in the treasury of the United States appropriated by Congress to pay a claim found by the Court of Claims to be due to one Sanders. It was contended that the suit was in effect one against the United States. In the course of the opinion it is said:

"But since the fund in question has been appropriated by act of Congress for payment to a specified person in satisfaction of a finding of the Court of Claims, it is clear that the officials of the Treasury are charged with the ministerial duty to make payment on demand to the person designated. It is settled that in such a case a suit brought by the person entitled to the performance of the duty against the official charged with its performance is not a suit against the government."

In Sterling v. Constantin, supra, the United States District Court entered an interlocutory injunction restraining the Governor and certain military officials of Texas from enforcing military orders restricting the production of plaintiff's oil wells, and it was contended that the suit was one against the state. In denying this contention, the court succinctly said:

"The suit is not against the state. The applicable principle is that, where state officials, purporting to act under state authority, invade rights secured by the Federal Constitution, they are subject to the process of the federal courts in order that the persons injured may have appropriate relief."

The Circuit Court of Appeals of this circuit, in Cargile v. New York Trust Company, supra, in discussing the contention that the suit in that case was one against the state, said:

"The mere fact, therefore, that the defendants are officers or agents of the state, does not in itself place them beyond the reach of equitable power. Immunity from suit is an attribute of sovereignty which cannot be invoked by public officers when sued for their own wrongful acts, even though such acts might be committed under color of an unconstitutional statute. Individual officers of a state do not constitute a privileged class, but are amenable to the law, and they cannot interpose the shield of the Eleventh Amendment."

To attempt a review of the various decisions of the Supreme Court on this subject would unduly extend this opinion and serve no useful purpose.

Immunity from suit is an attribute of sovereignty. It was the theory of the English law that the king could do no wrong, but it developed that his ministers could. When the acts of officers, sought to be controlled by injunction or mandamus, represent the sovereign will, the suit cannot be maintained because the state is then the real party. The converse of this rule is likewise true, that, when the acts of the officers are in violation of the sovereign will of the state, then their acts may be controlled by injunction or mandamus. A distinction is to be drawn between the government or administrative agencies of the state and the state itself. The state in contemplation of the Eleventh Amendment, is an abstraction, an ideal entity, "intangible, invisible, immutable." The government, on the other hand, is the agency through which the state acts. When the government functions within the limitations of its powers as fixed by the Constitutions of the state and the United States, it represents the state, but when that government violates these inhibitions and transcends its limitations, it is a lawless usurper. The government of the state, and the state's administrative agencies, as distinguished from the sovereign state which can do no wrong, are subject to the sovereign will—the mandates and inhibitions of the State and Federal Constitutions—as are the private citizens. Hence, when the Legislature of a state passes an act within the limits imposed by the State and Federal Constitutions, that act is the sovereign will, but, if an act transcends such limits, it is a mere nullity, and the legislative agency thereby commits a wrongful act. The principle is well stated by the Supreme Court in Poindexter v. Greenhow, 114 U. S. 270, 5 S. Ct. 903, 914, 962, 29 L. Ed. 185, where the court, among other things, said:

"In the discussion of such questions, the distinction between the government of a state and the state itself is important, and should be observed. In common speech and common apprehension they are usually regarded as identical; and as ordinarily the acts of the government are the acts of the state, because within the limits of its delegation of power, the government of the state is generally confounded with the state itself, and often the former is meant when the latter is mentioned. The state itself is an ideal person, intangible, invisible, immutable. The government is an agent, and, within the sphere of the agency, a perfect representative; but outside of that, it is a lawless usurpation. The constitution of the state is the limit of the authority of its government, and both government and state are subject to the supremacy of the Constitution of the United States, and of the laws made in pursuance thereof. So that, while it is true in respect to the government of a state, as was said in Langford v. United States, 101 U. S. 341 [25 L. Ed. 1010], that the maxim, that the king can do no wrong, has no place in our system of government; yet it is also true, in respect to the state itself, that whatever wrong is attempted in its name is imputable to its government, and not to the state, for, as it can speak and act only by law, whatever it does say and do must be lawful. That which, therefore, is unlawful because made so by the supreme law, the constitution of the United States, is not the word or deed of the state, but is the mere wrong and trespass of those individual persons who falsely speak and act in its name."

In the instant case, the legislative acts of 1933, which purport to divert and appropriate these funds to other purposes, are unconstitutional and hence there has been no lawful appropriation of the revenue in the hands of the treasurer to these other purposes. On the other hand, by prior acts confessedly constitutional, these funds have been pledged, set aside, and appropriated.

We conclude that the suit is not one against the state, and that the plaintiffs are entitled to the injunctional relief prayed for as against the defendant.

We have permitted the county judges of the various counties to intervene in this suit, and they assert that the defendant has in his possession funds belonging to the county highway fund which were appropriated by Act No. 48 of the 1933 General Assembly (page 130), and which are the property of the various counties. It is their contention that these funds should not be subject to injunction.

Under the provisions of Act No. 606 of the 1921 Session of the General Assembly (page 685), there was imposed a tax of one cent per gallon on gasoline sold in the state, this tax to be collected by the county collectors and divided by the county courts, one-half to the county general road fund, and one-half to the Treasurer of the State of Arkansas for the benefit of the state highway improvement fund. Prior to 1921 the principal source of revenue available for the construction and maintenance of county roads was a 3-mill road tax. By Act No. 501 of the 1923

General Assembly (page 408), there was imposed a tax of 3 cents per gallon on gasoline, 75 per cent. of which was dedicated to the county highway improvement fund, and 25 per cent. of which was dedicated to the state highway improvement fund. By Act No. 5 of the 1923 General Assembly (Extra Session, p. 11) there was established a comprehensive system of state highways, and a tax of 4 cents per gallon on gasoline was levied for the purpose of constructing and maintaining the highways of the state system and to assist the counties in maintaining and improving county roads.

Under the provisions of Act No. 81 of the 1927 General Assembly (page 221), 50 per cent. of the 3-mill road tax which had theretofore been used by the counties for the maintenance and construction of county roads was appropriated for the purpose of improving streets in municipalities. Under the provisions of Act No. 11 of the 1927 General Assembly (page 17), a tax of 5 cents a gallon was imposed for the purpose of benefiting the state highway system. At least, this is the conclusion of the pleader in intervention. In 1931 a 6 cents tax was imposed on gasoline, five-sixths of which was to be deposited in the state treasury to the credit of the state highway fund, and one-sixth to the credit of a fund known as the county highway fund. The proceeds of the fund were to be distributed to the counties quarterly. The statute provided, however, that, if the total revenue produced from the 6 cents tax should be less than $7,500,000 a year, the deficit should be taken from the county highway fund for any such year before an allotment to the counties was made (Act No. 63, 1931 General Assembly [page 171]).

Act No. 48 of the 1933 General Assembly repealed and struck out from Act No. 63 of the 1931 General Assembly section 6 thereof, which contained provision that, in the event the revenue should be less than $7,500,000 in any one year, the allotment to the counties should not be made until after the deficit should have been provided for. This legislation has already been referred to and need not again be set out nor summarized.

The question to be determined is whether the one-cent revenue from the gasoline tax, allocated to the county highway fund by the 1931 General Assembly, could constitutionally be so allocated by the 1933 legislation, regardless of whether the revenue from gasoline tax was less than $7,500,000 per annum, contrary to the provisions of the 1931 act to the effect that none of it should be paid into the county highway fund until and unless the revenue produced should equal that sum. Prior legislation pledged this revenue to the payment of interest and principal of the highway and tollbridge bonds. As has already been observed, by contract set out in legislative enactment and embodied in these bonds, the revenue of the state derived from automobile licenses and fees, and from a tax on gasoline, and on any substitute thereof used in propelling automobiles on its highways, was set aside out of the first revenues collected in an amount sufficient to pay the accruing interest and the maturing bonds during the periods designated. It was expressly covenanted in the statutes that as long as any of these contract obligations were outstanding, the state would not permit sections 35 and 36 of Act No. 5 (Ex. Sess.), approved October 10, 1923, to be repealed nor amended so as to reduce the revenue therein provided for, and that, if the revenue arising from these sources should fall below $7,500,000 per annum, it would amend sections 35 and 36 so as to provide for an annual minimum levy of $7,500,000, and in 1929 such an amendment was adopted.

The interveners contend that the legislation relative to the funds derived for improvement of county highways in no manner violates the contracts of the state; but the manifest purpose and effect of Act No. 48 of the 1933 General Assembly was to displace the guaranteed priority of payment of the bonds of the state and interest from funds raised by taxation of motor vehicles and gasoline and to substitute therefor a priority in favor of the county highway fund. It is clear that this act, in providing that certain funds should go to the county highway fund from the revenue raised by taxation of motor vehicles and gasoline, impairs the obligation of the contracts made by the state, to the effect that the treasurer should set aside out of the first revenue collected from these sources during each semiannual period, funds sufficient to pay all obligations of the series of bonds and interest thereon maturing and accruing during such period.

The prayer of the interveners must therefore, be denied.

Counsel for plaintiffs may prepare findings and conclusions and form of decree in accordance with this opinion.